# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

Case No. 12-4067

---

IN RE:  BLOOD REAGENTS ANTITRUST LITIGATION

---

Appeal from the Order of the United States District Court for
the Eastern District of Pennsylvania Granting Class Certification
in Multi-District Litigation Docket No. 2:09-MD-02081-JD

---

## OPENING BRIEF OF APPELLANT
## ORTHO-CLINICAL DIAGNOSTICS, INC.
## AND VOLUME I OF JOINT APPENDIX

---

Jerome A. Swindell
Assistant General Counsel
JOHNSON & JOHNSON
1 Johnson & Johnson Plaza
New Brunswick, NJ  08933
Telephone:  (732) 524-0400

Paul H. Saint-Antoine
Joanne C. Lewers
Richard E. Coe
Chanda A. Miller
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA  19103
Telephone:  (215) 988-2700

*Attorneys for Appellant Ortho-
Clinical Diagnostics, Inc.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Appellant Ortho-Clinical Diagnostics, Inc. is a wholly owned subsidiary of Janssen Pharmaceuticals, Inc., which is a wholly owned subsidiary of Johnson & Johnson. Johnson & Johnson is a publicly held corporation and no publicly held corporation owns 10% or more of its stock. No other publicly held corporation which is not a party to this proceeding has a financial interest in the outcome of the proceeding.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................iv

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................1

RELATED CASES AND PROCEEDINGS..........................................2

STATEMENT OF THE CASE.............................................................2

STATEMENT OF FACTS ...................................................................7

I.     BOTH DEFENDANTS OFFERED MORE THAN FORTY BLOOD
REAGENT PRODUCTS WITH DISTINCT FUNCTIONS, PRICES,
COSTS, AND DEMAND FACTORS ...........................................7

II.    ADVANTAGES OF NONTRADITIONAL REAGENTS AND THE
MARKET SHIFT TO NONTRADITIONAL REAGENTS .........................8

III.   HISTORY OF THE BLOOD REAGENTS MARKET .................................9

     A.    Prices Decrease and Costs Increase in the 1990s.................................9

     B.    Immucor Consolidates the Blood Reagents Market to a
Duopoly ...............................................................................11

     C.    Post-1999 Price Increases....................................................12

          1.    Ortho Planned an Initial Price Increase, Under
"Operation Create Value," in 1999..........................12

          2.    Ortho Adopts a New Price Increase Plan, the "Blood
Bank Leadership Program," in September 2000 ....................13

          3.    Immucor Undercuts Ortho's 2000 and 2001 Price
Increases to Gain Market Share ...............................14

          4.    Ortho Raises Prices in 2005 to Compensate for Increased
Raw Material Costs..................................................16

          5.    Immucor Adopts a Pricing Differentiation Strategy in an
Effort to Capture Market Share................................16

          6.    Ortho Increases Prices in 2008 to Encourage Its
Traditional Reagent Customers to Purchase Its
Nontraditional Reagents...........................................18

          7.    Immucor Continues Its Pricing Differentiation Strategy
to Gain Market Share ...............................................18

      D.     Plaintiffs' Expert Report on Economics ............................................21

SUMMARY OF ARGUMENT .............................................................................22

STANDARD AND SCOPE OF REVIEW ............................................................25

ARGUMENT .......................................................................................................27

I.     THE DISTRICT COURT ERRED WHEN IT DEFERRED ITS
      ASSESSMENT OF THE MERITS AND RELIABILITY OF
      DR. BEYER'S MODEL, AND WHEN IT SHIFTED THE BURDEN
      OF PROOF TO ORTHO ON OTHER ISSUES ESSENTIAL TO A
      FINDING OF COMMON PROOF ............................................................27

      A.     At the Class Certification Stage, the Court Is Required to
            Evaluate Merits and Reliability Issues in Determining Whether
            Common Proof of Impact and Damages Is Available .....................28

      B.     Dr. Beyer's Model Does Not Withstand the Rigorous Analysis
            that the District Court Should Have Applied ....................................33

            1.     Dr. Beyer's Methodology Is Unscientific and Unreliable
                     Because It Is Not Based on Data or Documents
                     Reasonably Relied upon by Economists...................................34

            2.     The District Court Improperly Shifted to Ortho the
                     Burden of Proving that It Adopted the BBLP Before the
                     Start of the Alleged Conspiracy................................................36

            3.     Dr. Beyer's Application of His "Benchmark"
                     Methodology Was Also Ad Hoc and Speculative ..................39

             4.     The District Court Did Not Make a Necessary Finding on
                     Whether Dr. Beyer's Failure to Account for Demand and
                     Cost Had a Material Effect on His Economic Model.............41

             5.     The District Court Erred by Deferring Analysis of
                     Dr. Beyer's RhoGAM Benchmark ..........................................44

      C.     The Remaining Elements of "Common Proof" Proffered by
             Plaintiffs Fail to Distinguish Between Supra-Competitive
             Pricing from the Duopoly and from the Alleged Price-Fixing
             Conspiracy..........................................................................................46

II.    THE DISTRICT COURT ERRED BY ADOPTING AN
       INCORRECT STANDARD OF ANTITRUST IMPACT FOR
       PRICE-FIXING CASES ..............................................................................48

       A.    Antitrust Impact Requires Each Plaintiff to Show that It Was
             Injured in Fact ...................................................................................48

       B.    The District Court Substituted a Lower Standard of Antitrust
             Impact for a Rigorous Analysis of Dr. Beyer's Model .....................51

III.   THE DISTRICT COURT ERRED BY CERTIFYING A CLASS
       WITH THOUSANDS OF INDIVIDUAL FRAUDULENT
       CONCEALMENT CLAIMS, WHILE NOT REQUIRING
       PLAINTIFFS TO PRESENT ANY TRIAL PLAN FOR
       RESOLVING SUCH CLAIMS ...................................................................54

       A.    Each Element of Fraudulent Concealment Gives Rise to
             Individualized Issues .........................................................................55

       B.    The District Court Also Erred by Not Requiring a Trial Plan for
             Resolving the Thousands of Fraudulent Concealment Claims ..........58

CONCLUSION ...................................................................................................61

# TABLE OF AUTHORITIES

## CASES

*Advent Sys. Ltd. v. Unisys Corp.*,
  925 F.2d 670 (3d Cir. 1991) .............................................................40

*Allen v. Dairy Farmers of Am. Inc.*,
  279 F.R.D. 257 (D. Vt. 2011) .............................................................50

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp., L.P.*,
  247 F.R.D. 156 (C.D. Cal. 2007) ................................................38, 50

*Am. Honda Motor Co. v. Allen*,
  600 F.3d 813 (7th Cir. 2010) .............................................................31

*Amgen Inc. v. Conn. Retirement Plans & Trust Funds*,
  568 U.S. __, 133 S. Ct. 1184 (2013)..................................................27

*In re Aspartame Antitrust Litig.*,
  416 F. App'x 208 (3d Cir. 2011) .......................................................56

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990).....................................................................48, 52

*Blue Cross & Blue Shield United v. Marshfield Clinic*,
  152 F.3d 588 (7th Cir. 1998) .............................................................43

*In re Chocolate Confectionary Antitrust Litig.*,
  MDL No. 1935, 2012 U.S. Dist. LEXIS 174681
  (M.D. Pa. Dec. 7, 2012).............................................................27, 31

*Comcast Corp. v. Behrend*,
  569 U.S. __, 133 S. Ct. 1426 (2013)...........................................*passim*

*Comcast Corp. v. Behrend*,
  655 F.3d 182 (3d Cir. 2011),
  *rev'd* 569 U.S. __, 133 S. Ct. 1426 (2013) .......................................23

*In re Constar Int'l Inc. Sec. Litig.*,
  585 F.3d 774 (3d Cir. 2009) .............................................................25

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ......................................................................26

*Eleven Line, Inc. v. N. Tex. State Soccer Ass'n*,
   213 F.3d 198 (5th Cir. 2000) .......................................................44

*Exhaust Unlimited, Inc. v. Cintas Corp.*,
   223 F.R.D. 506 (S.D. Ill. 2004) ...........................................49, 50, 51

*Forbes v. Eagleson*,
   228 F.3d 471 (3d Cir. 2000) .........................................................55

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig.* (No. II),
   MDL No. 1687, 2012 U.S. Dist. LEXIS 13887
   (D.N.J. Feb. 6, 2012) ................................................................ 57-58

*Home Placement Serv., Inc. v. Providence Journal Co.*,
   819 F.2d 1199 (1st Cir. 1987) ......................................................44

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. 2008) .................................................*passim*

*JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc.*,
   No. 97-CV-652, 1998 U.S. Dist. LEXIS 5098 (E.D. Pa. Apr. 15, 1998)...........40

*Kenett Corp. v. Mass. Furniture & Piano Movers Ass'n*,
   101 F.R.D. 313 (D. Mass. 1984) ....................................................51

*Klehr v. A.O. Smith Corp.*,
   521 U.S. 179 (1997) ......................................................................54

*Kottaras v. Whole Foods Market, Inc.*,
   281 F.R.D. 16 (D.D.C. 2012), *appeal denied sub. nom.*,
   No. 12-8003, 2012 U.S. App. LEXIS 8174 (D.C. Cir. Apr. 20, 2012)..............49

*Kypta v. McDonald's Corp.*,
   671 F.2d 1282 (11th Cir. 1982) ...............................................49, 51

*Lantec, Inc. v. Novell, Inc.*,
   No. 2:95-CV-97, 2001 U.S. Dist. LEXIS 24816
   (D. Utah Feb. 13, 2001) ...............................................34-35, 38-39, 43

*In re Live Concert Antitrust Litig.*,
   863 F. Supp. 2d 966 (C.D. Cal. 2012) ................................................34

*Nafar v. Hollywood Tanning Sys.*,
   339 F. App'x 216 (3d Cir. 2009) ........................................................59

*Pace Elecs., Inc. v. Canon Computer Sys., Inc.*,
   213 F.3d 118 (3d Cir. 2000) ...............................................................49

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,
   100 F. App'x 296 (5th Cir. 2004) ......................................................57

*In re Plastics Additives Antitrust Litig.*,
   No. 03-CV-2038, 2010 U.S. Dist. LEXIS 90135
   (E.D. Pa. Aug. 31, 2010)...............................................21, 34, 35

*Superior Offshore Int'l, Inc. v. Bristow Grp.*,
   490 F. App'x 492 (3d Cir. 2012) .......................................................47

*Unger v. Amedisys Inc.*,
   401 F.3d 316 (5th Cir. 2005) .............................................................31

*Wachtel v. Guardian Life Ins. Co.*,
   453 F.3d 179 (3d Cir. 2006) .......................................................24, 58

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. __, 131 S. Ct. 2541 (2011)................................26, 31, 60, 61

*White v. R.M. Packer Co.*,
   635 F.3d 571 (1st Cir. 2011).............................................................47

*ZF Meritor, Inc. v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012) .............................................................35

*In re Zurn Pex Plumbing Prods. Litig.*,
   644 F.3d 604 (8th Cir. 2011) ............................................................31

## STATUTES, RULES & REGULATIONS

15 U.S.C. § 1 ...............................................................................................3

15 U.S.C. § 15b...........................................................................................54

28 U.S.C. § 1292.........................................................................................1

28 U.S.C. § 1331 ...................................................................................1

28 U.S.C. § 1337 ...................................................................................1

Fed. R. Civ. P. 5 ...................................................................................1

Fed. R. Civ. P. 23 ......................................................................1, 24, 58

Fed. R. Civ. P. 23 advisory comm. note on 2003 amendments...............59

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1337. This Court has jurisdiction over the case pursuant to 28 U.S.C. § 1292(e) and Rule 5 of the Federal Rules of Appellate Procedure and Rule 23(f) of the Federal Rules of Civil Procedure. The district court entered its order certifying a class on August 22, 2012. Appellant Ortho-Clinical Diagnostics, Inc. ("Ortho") filed its Petition for Permission to Appeal on September 5, 2012, and this Court granted the Petition on October 25, 2012.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Whether the district court erred in deferring an analysis of the "merits" and "reliability" of Plaintiffs' model of antitrust impact and damages until after the class certification stage? *See* JA-38-39, JA-44-46 (Mem.); JA-304-05, JA-307-08, JA-312-13, JA-315-16 (Class Cert. Hr'g Tr.).

2.      Whether the district court further erred by shifting the burden of proof to Ortho on certain issues of fact essential to a finding of common proof? *See* JA-14, JA-15-16 (Mem.); JA-307-08 (Class Cert. Hr'g Tr.).

3.      Whether the district court erred by accepting as common proof of antitrust impact and damages an unscientific, speculative, and ad hoc model of duopoly pricing that was based on hearsay statements in Ortho's business plans?

*See* JA-27, JA-44-48 (Mem.); JA-305-06, JA-313-15, JA-323-25, JA-335, JA-339-43 (Class Cert. Hr'g Tr.).

4. Whether the district court erred in adopting a standard of "antitrust impact" that does not account for the net economic effect of the alleged conspiracy on the class members who purchased from Defendants a diverse mix of traditional blood reagents and, in many cases, nontraditional blood reagents? *See* JA-36-37 (Mem.); JA-306-07, JA-349-52 (Class Cert. Hr'g Tr.); JA-4748 (Ortho's Surreply Mem. in Opp'n to Pls.' Mot. for Class Cert.).

5. Whether the district court erred in certifying a class that would require the adjudication of thousands of fraudulent concealment claims, without requiring Plaintiffs to present a trial plan for resolving such claims and without allowing Ortho absent class member discovery on such issues? *See* JA-49-51 (Mem.); JA-352-60 (Class Cert. Hr'g Tr.).

## RELATED CASES AND PROCEEDINGS

This case has not previously been before this Court. Ortho is not aware of any related cases or proceedings.

## STATEMENT OF THE CASE

The putative class in this case consists of direct purchasers from Ortho and Immucor, Inc. ("Immucor") of "traditional" blood reagents, which are products used to type and screen human blood. The Consolidated Amended Class Action

Complaint ("Complaint") alleges that Ortho and Immucor conspired to fix prices for blood reagents, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. The price fixing allegations in the Complaint are directed at more than forty different, non-interchangeable blood reagent products, encompassing both traditional and nontraditional blood reagents. Ortho and Immucor allegedly began to fix prices for blood reagents no later than January 1, 2000, which was a short time after acquisitions by Immucor created a duopoly market.[1]

On September 16, 2011, Plaintiffs filed their Motion for Class Certification ("Motion") pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. Plaintiffs submitted two expert reports in support of their Motion, including one by an industry expert, Teresa Harris, and another by an economic expert, Dr. John Beyer. In his report, Dr. Beyer proposed two different methodologies for showing common proof of antitrust impact and damages: (1) a "benchmark," and (2) a "yardstick" approach. At his deposition, Dr. Beyer did not commit to using either of these methodologies at trial. JA-3610-12. He described

---

[1] In 2007, the Federal Trade Commission ("FTC") began a formal inquiry into whether Immucor's unilateral conduct in its acquisition of certain competing blood reagents suppliers in the 1990s violated Section 5 of the FTC Act, 15 U.S.C. § 45, or Section 7 of the Clayton Act, 15 U.S.C. § 18. After this private antitrust litigation began, both the FTC investigation and a subsequent investigation by the U.S. Department of Justice of Ortho and Immucor were closed, with no action taken by the enforcement agencies against either company.

the application of his "benchmark" to be "most preliminary," JA-3515-16, and subject to "serious reconsideration," JA-3521-22. Dr. Beyer also testified that he had not performed even a preliminary analysis using the "yardstick" model, and that he did not have the data he needed to conduct such an analysis. JA-3510, JA-3520, JA-3661-62.

On March 2, 2012, Ortho filed its Opposition to Plaintiffs' Motion for Class Certification ("Opposition").[2] Ortho challenged Plaintiffs' economic proof as unreliable and incapable of proving class-wide impact and damages. In support of its Opposition, Ortho offered the expert report of Dr. Peter Bronsteen, who criticized Dr. Beyer's benchmark model as unscientific and speculative. Specifically, Dr. Bronsteen observed that Dr. Beyer did not account for basic factors that economists use to predict price, including market structure, cost, and demand. JA-4170-75. Dr. Bronsteen also criticized Dr. Beyer's work as ad hoc, because Dr. Beyer selected certain Ortho business plans to support his opinions on impact and damages, while ignoring other business plans which would have led to different results. JA-4175-78. In addition, Ortho opposed class certification on the

---

[2] Before Ortho filed its Opposition, TPG Capital, a private investment firm, acquired Immucor. Immucor and Plaintiffs subsequently settled Plaintiffs' claims against Immucor.

basis that Plaintiffs' fraudulent concealment claims were an additional source of individualized issues that would predominate at trial.

After Ortho submitted its Opposition, Plaintiffs and their expert significantly changed their proposed methodologies. Dr. Beyer dropped the "yardstick" as a standalone methodology for measuring impact and damages. He also substantially changed his "benchmark" by, for example, moving the baseline for his first but-for price increase by one year, from 2000 to 2001.

Shortly before the date scheduled for the hearing on class certification, Plaintiffs informed Ortho and the district court that Dr. Beyer's health would prevent him from attending the hearing. JA-222-23. Ortho asked the district court to postpone the hearing until Dr. Beyer would be able to provide live testimony. JA-224-25. The district court declined to postpone the hearing, and it proceeded on July 26, 2012.

Plaintiffs did not present any witnesses during their case-in-chief; Ortho presented Dr. Bronsteen. Plaintiffs' rebuttal evidence consisted of testimony by Dr. Beyer, which was solicited via videotaped testimony taken on August 6, 2012. During Plaintiffs' examination of Dr. Beyer, Ortho made a standing objection to the reliability of his testimony, as it related to his proposed methodology for proving impact and damages. JA-669. After Dr. Beyer's testimony was provided to the district court on August 8, 2012, Ortho requested additional argument

regarding his expert opinions and methodologies, but the district court denied this request on August 13, 2012.  JA-914, JA-917.

On August 22, 2012, the district court granted Plaintiffs' Motion.  Despite acknowledging "some deficiencies" with Dr. Beyer's model and "some force" to Ortho's criticisms, the district court concluded that "it must defer" further analysis of the merits and reliability of Dr. Beyer's model until the summary judgment stage.  *See* JA-39, JA-44 (District Court's Mem. in Support of Order Granting Pls.' Mot. for Class Cert. ("Mem.")).  The district court also deferred consideration of the individual fraudulent concealment issues, reasoning that individual issues such as notice and due diligence could be dealt with at a later stage of the litigation.  JA-49-50.

On October 25, 2012, this Court granted Ortho's Petition for Permission to Appeal pursuant to Rule 23(f) of the Federal Rules of Civil Procedure.  On January 4, 2013, this Court granted Ortho's unopposed motion to extend the deadline for filing its opening brief and the joint appendix until thirty days after the United States Supreme Court issued its decision in *Comcast Corp. v. Behrend*, No. 11-864.

On March 27, 2013, the Supreme Court issued its opinion on the class certification order challenged in *Comcast*, reversing the judgment of this Court. *Comcast Corp. v. Behrend*, 569 U.S. __, 133 S. Ct. 1426 (2013).  Ortho provided

notice of that decision the following day, and this Court issued a revised Briefing

and Scheduling Order on March 29, 2013.

## STATEMENT OF FACTS

The facts regarding the blood reagents sold by Ortho and Immucor are far

more complicated than those presented by Plaintiffs, as is the history of each

manufacturer's respective price increases, which were not in parallel and which led

to a substantial price gap between the companies. Moreover, "[e]stimating but-for

prices is particularly difficult in this case," as the district court observed, "because

defendants' duopoly was created only a short time before they allegedly conspired

to fix prices." *See* JA-40.

## I.   BOTH DEFENDANTS OFFERED MORE THAN FORTY BLOOD REAGENT PRODUCTS WITH DISTINCT FUNCTIONS, PRICES, COSTS, AND DEMAND FACTORS.

In their Complaint, Plaintiffs allege a conspiracy involving "blood reagents,"

which Plaintiffs define as all substances designed and manufactured to test, match,

screen, diagnose, and/or otherwise identify certain properties of the cell and serum

components of human blood, including Defendants' nontraditional reagents.[3] JA-

89-90, JA-99, JA-101-02. In their Motion, however, Plaintiffs narrowed the class

---

[3] The terms "proprietary" and "automated" are often used synonymously with
"nontraditional."

definition to cover purchases of traditional blood reagents, which Plaintiffs define as blood reagents used manually in tubes. *See* JA-1085 (Harris Report).

Blood reagents perform various different functions in the blood transfusion process. They are used to determine A/B/O blood type and Rh type (i.e., whether a blood type is positive or negative). They also detect the presence of antibodies, using "screening" tests, and identify specific antibodies. JA-1088-91 (Harris Report). Ortho and Immucor each offered more than forty different blood reagent products. JA-1085, JA-1103 (Harris Report). Each traditional blood reagent product has its own particular, non-interchangeable purpose, and each is subject to its own supply and demand factors. *See* JA-3609 (Beyer Dep.). In order to compare price for competing blood reagent products, a customer needs to compare the price per test for each reagent. JA-3888 (Harris Dep.).[4]

## II.   ADVANTAGES OF NONTRADITIONAL REAGENTS AND THE MARKET SHIFT TO NONTRADITIONAL REAGENTS.

Plaintiffs and Dr. Beyer virtually ignore the other broad category of blood reagents – nontraditional blood reagents – even though more than 50% of the putative class members purchase at least some nontraditional reagents. Ortho's

---

[4] Dr. Beyer did not perform this pricing analysis. Among his many other analytical short cuts, he simply assumed that one package of an Immucor product could be used to perform the same number of tests as one package of an Ortho product, even though the companies offered different package sizes. JA-3595-96 (Beyer Dep.).

nontraditional reagents – referred to as ID-MTS gel reagents – can be used manually or with Ortho's automated instrument, which is sold under the brand name ProVue. Immucor's nontraditional reagents – referred to as Capture solid-phase technology – can be used manually but are typically used with Immucor's automated instruments, which Immucor sold under the brand names ABS 2000, Galileo, and Echo. JA-4156-57 (Bronsteen Report). Nontraditional blood reagents save labor costs because they reduce the number of steps required to a complete a test, thereby reducing the opportunities for human errors. *See, e.g.*, JA-3811-13, JA-3863-66 (Harris Dep.).

Many customers substituted nontraditional reagents for traditional blood reagents during the class period. Ms. Harris admitted that nontraditional reagents are interchangeable with traditional reagents – under her definition of "interchangeable" – largely because nontraditional reagents perform the same function as traditional reagents. JA-3872-73, JA-3877-78 (Harris Dep.). By 2008, 52% of the proposed class used nontraditional reagents. JA-2585 (Trinity Partners, LLC Q4 2008 Market Estimation).

## III.    HISTORY OF THE BLOOD REAGENTS MARKET.

### A.    Prices Decrease and Costs Increase in the 1990s.

In the years preceding the class period, traditional blood reagent prices decreased substantially, while their manufacturing costs increased substantially.

The average price for a vial of Ortho's Anti-A, for example, declined from $20.67 in 1975 to $2.25 in 1999.  At the same time, Ortho's average cost to manufacture this product increased from $3.49 to $5.05.  JA-2630, JA-2634 (Oct. 2000 Ortho Blood Bank Leadership Program ("BBLP") Presentation).  By 1999, Ortho was losing more than $3,000,000 per year on traditional reagent revenues of $11.5 million – a total profit margin of negative 28%.  JA-2646 (Aug. 1999 Ortho Blood Bank Pricing Presentation).  As the graph below demonstrates, even after multiple price increases by both Immucor and Ortho during the class period, their 2009 inflation-adjusted prices were comparable to prices in the late 1970s and early 1980s.

**Exhibit 3A**
**Historical Perspective on Anti-A Average Annual Prices**



JA-4166, JA-4225-28 (Bronsteen Report).

Cost increases prior to the class period were due, in significant part, to increased regulatory requirements, which affected both blood reagent manufacturers and their suppliers.  *See* JA-2662-64 (Feb. 2001 Ortho Media Stand By Materials).  Among other things, Ortho had spent $60 million by January 2000 to comply with Good Manufacturing Process Compliance Guidelines ("GMPs") "ordered by the government in the blood banking field."  JA-2683 (Draft Ortho Press Release).

### B.    Immucor Consolidates the Blood Reagents Market to a Duopoly.

This period of decreasing prices and increasing costs led to industry consolidation as fourteen manufacturers either exited the industry or were acquired during the 1980s and 1990s.  JA-2628 (Oct. 2000 Ortho BBLP Presentation).  Following Immucor's acquisition of three reagent manufacturers in the late 1990s, only Ortho and Immucor remained in the U.S.  JA-103 (Complaint); JA-2628 (Oct. 2000 Ortho BBLP Presentation).[5]

By 2000, Ortho and Immucor were each in a precarious financial position.  Immucor approached bankruptcy, and Ortho considered exiting the traditional blood reagents industry.  JA-12 (Mem.).  The blood reagents industry was poised for a price increase.  As explained by Dr. Bronsteen, the "question was not whether

---

[5] Ortho did not acquire any manufacturers in the 1990s.

prices would rise during the class period but instead by how much." JA-4161

(Bronsteen Report).

### C.    Post-1999 Price Increases.

#### 1.    Ortho Planned an Initial Price Increase, Under "Operation Create Value," in 1999.

In 1999, Ortho began to consider price increases for its traditional blood

reagents.  *See* JA-2638-60 (Aug. 1999 Ortho Pricing Presentation); JA-2695-96

(Burzik Script for Customer Video); JA-2737-39 (Dec. 1999 Ortho Project Create

Value Update); JA-4049-50 (Burzik Dep.).  This project was given the name

"**Operation Create Value**" ("OCV").  Ortho hired outside consultant Norbridge

Inc. to assist with OCV.  JA-2717 (Sept. 1999 Engagement Letter).  Ortho adopted

a plan for an initial price increase of 25% in April 2000, followed by additional

price increases for the next four years.  *See* JA-4054 (Hakanson Dep.).

Given its unprofitable financial situation, Ortho was undeterred by the risk

of losing market share.  Ortho predicted that it would lose 20% to 30% of its

customers after it increased prices if Immucor did not increase its own prices

immediately.  Still, Ortho decided it would be better off financially with higher

prices and less market share than with continued unprofitability.  JA-2927-29 (Jan.

2000 Fax from Office of the President); JA-4177-78 (Bronsteen Report).

### 2. Ortho Adopts a New Price Increase Plan, the "Blood Bank Leadership Program," in September 2000.

Even after the initial 25% price increase, Ortho lost $3.7 million in 2000 and had a negative 29.8% profit margin on its sales of traditional blood reagents. JA-2670 (2001 Blood Bank Mktg. Plan). By September 2000, after concluding that a larger price increase would be necessary if its traditional blood reagents were to become financially viable, Ortho created the "**Blood Bank Leadership Program**" ("BBLP"). Under BBLP, Ortho's strategy shifted from multiple price increases over a number of years to one large "market correction" in the amount of 100% or more. *See, e.g.*, JA-4054-58 (Hakanson Dep.).

Several factors prompted Ortho's decision to change to one "market correction" instead of multiple, smaller price increases: (1) Ortho was still losing a significant amount of money; (2) multiple increases required significant resources on the part of Ortho and its customers to implement each increase; and (3) a higher price on traditional reagents would provide incentives for customers to switch to Ortho's more efficient ID-MTS gel products. JA-2932-42 (Sept. 2000 Ortho Traditional Blood Bank Market Correction Plan Presentation); JA-2947, JA-2949 (Nov. 2000 Ortho BBLP Presentation).

Ortho had other reasons to pursue a more aggressive price increase after its experience with the initial 25% price increase. OCV was premised on no increases in costs; in reality, costs increased significantly in 2000. JA-424 (Class Cert. Hr'g

Tr.); JA-2785 (Dec. 1999 Ortho Project Create Value Update). Plus, by September 2000, Ortho knew that Immucor had decided to follow Ortho's April 2000 price increase with a price increase of its own in July 2000. JA-3136-42 (July 2000 Poynter E-mail). That gave Ortho its first real world experience as a price leader in the newly formed duopoly, which is something it did not have when OCV was adopted in late 1999.

Ortho began informing customers about the BBLP at least as early as September 2000, so that they could prepare their budgets accordingly. JA-2621-37 (Oct. 2000 Ortho BBLP Presentation); JA-2950, JA-2954 (Nov. 2000 Ortho BBLP Presentation). Ortho finalized its 2001 price list, consistent with BBLP, by October 30, 2000. *Compare* JA-2621-37 (Oct. 2000 Ortho BBLP Presentation), *with* JA-2996, JA-3000 (Nov. 2000 BBLP Field Implementation Guide). It sent a formal letter to customers with the new price list on November 21, 2000. JA-2996-3000 (Nov. 2000 BBLP Field Implementation Guide).

### 3. Immucor Undercuts Ortho's 2000 and 2001 Price Increases to Gain Market Share.

Immucor implemented smaller price increases in 2000 and 2001, which allowed Immucor to undercut Ortho and gain market share. First, after Ortho implemented its initial 25% increase in April 2000, Immucor implemented a 10% to 20% increase for some customers in July 2000. JA-3136-42 (July 2000 Poynter E-mail).

After Ortho sent customers its new price list on November 21, 2000,

Immucor offered a "bounty" to its sales force for Ortho pricing information. JA-

4118-21 (Gallup Dep.). Immucor paid a bounty to the sales representative, Tim

Driscoll, who obtained Ortho's November 21, 2000 price list from a customer. *Id.*

Immucor did not finalize its own blood reagent prices until after it received the

Ortho price list from Mr. Driscoll. JA-4120-21 (Gallup Dep.).[6] Again, Immucor

implemented its own price increases, but at a substantially lower rate than Ortho.

Unlike Ortho, Immucor offered significant discounts to customers in 2001

depending on their purchase volume. For example, Immucor customers buying

more than $1,000 of reagents paid between $0.89 to $0.98 per mL for Anti-A, less

than Ortho's price of $1.30 per mL for Anti-A. JA-2999 (Ortho 2001 Price List);

JA-2255-60 (Immucor 2001 Price List). Its price disparity with Immucor in 2001

resulted in Ortho losing contracts with two large Group Purchasing Organizations

---

[6] Throughout their arguments on class certification, Plaintiffs focused much attention on a lunch meeting between an Ortho employee, David Gendusa, and an Immucor employee, Judy Thorne, which took place on November 21, 2000 – the same date Ortho sent its price increase letters to customers. Ms. Thorne, who had a previous romantic relationship with Mr. Gendusa, testified that he showed her a copy of an Ortho price list that he kept in his briefcase. JA-4086, JA-4091, JA-4094. The lunch could not have been part of a conspiracy to fix prices because it took place *after* Ortho had already met with customers to discuss the price increase and finalized its 2001 price list. Whether the lunch meeting is probative of a conspiracy need not be resolved for purposes of assessing whether Plaintiffs have met their burden of proffering common proof of the separate elements of impact and damages.

("GPOs"), HealthTrust Purchasing Group ("HPG") and Premier.  JA-3146 (May 2000 Quarterly Report Mem.); JA-3149 (Ortho Corporate Accounts Presentation); JA-3161-72 (July 2002 Ortho Premier Report); JA-3173 (July 2002 Ortho Customer Letter).  The specific timing of the 2001 price increases also varied between Ortho and Immucor.  JA-4185, JA-4238 (Bronsteen Report).

### 4.    Ortho Raises Prices in 2005 to Compensate for Increased Raw Material Costs.

Ortho began planning its next significant increase at least as early as April 2004.  JA-3174 (Apr. 2004 Raffin E-mail).  This price increase was due, in substantial part, to increases in the costs of certain raw materials.  Ortho calculated that, from 2000 to 2004, the cost of raw materials for its red blood cell products had increased by 127% and for its antisera by 97%.  JA-3175-77 (Aug. 2004 Sorenson E-mail).  Ortho began communicating with its GPO customers about the increase in early August 2004 and its non-GPO customers in mid-August.  JA-3177-94 (Aug. 2004 Ortho Training Presentation).  On September 13, 2004, Ortho sent a letter to its customers explaining the increase and attaching its 2005 price list.  JA-3195-97 (Sept. 2004 Ortho Customer Letter).

### 5.    Immucor Adopts a Pricing Differentiation Strategy in an Effort to Capture Market Share.

Immucor first learned about Ortho's 2005 increase on or about August 30, 2004, when it heard from customers who were members of the Broadlane and

Premier GPOs that Ortho planned to raise prices by 100% in the first quarter of 2005.  JA-3198 (Aug. 2004 Poynter E-mail).  Again, Immucor offered a bounty to its sales representatives for Ortho's new price list, which Immucor obtained from a customer.  *Id.*

Instead of matching Ortho's increase, Immucor began to implement its "**pricing differentiation strategy**" and "**price protection plan**" in order to gain additional market share from Ortho.  JA-3200, JA-3206, JA-3210-11, JA-3215-16 (Immucor Oct. 2004 Pricing Differentiation Strategy Presentation).  If customers purchased an Immucor automated instrument, Immucor provided price protection – by freezing their reagent prices at 2004 levels for five years.  JA-3220 (Sept. 2004 Poynter E-mail).  As part of its pricing differentiation strategy, Immucor also introduced its "**Customer Loyalty Program**," which provided different price tiers – "Base," "Level I," or "Level II" – depending on the percentage of reagents customers committed to purchasing from Immucor.  JA-3221-31 (Oct. 2004 Immucor Customer Letter).  All of Immucor's prices were less than Ortho's prices; Immucor's "Level II" price for Anti-A was approximately 64% less than Ortho's price.  *Compare* JA-3221-31 (Oct. 2004 Immucor Customer Letter), *with* JA-3195-97 (Sept. 2004 Ortho Customer Letter).  Also, as in 2000 and 2001, Ortho and Immucor did not implement their 2005 price increases at the same time.  *See* JA-4185, JA-4239 (Bronsteen Report).

6.    **Ortho Increases Prices in 2008 to Encourage Its Traditional Reagent Customers to Purchase Its Nontraditional Reagents.**

By October 2007, Ortho decided to implement a third significant price increase that would raise its traditional reagent prices by an average of 100%, effective in March 2008.  JA-3337 (Oct. 2007 Ortho Price Action Presentation). Ortho began meeting with customers to introduce the increase in December 2007 and sent letters announcing the increase to its customers in January 2008.  JA-3362 (Nov. 2007 Ortho Pricing Presentation).  The increase was intended, among other things, to address the increasing costs of supporting a smaller number of traditional reagent customers, as more customers switched to nontraditional reagents.  JA-3393-3401 (2008 Ortho Pricing Presentation).  By September 2007, nearly 80% of Ortho's customers were using its nontraditional gel product.  JA-3239 (Trinity Partners, LLC Q3 2007 Market Estimation).  By contrast, Immucor's substantially lower prices on traditional blood reagents contributed to only 14% of its customers using nontraditional reagents.  *Id*.

7.    **Immucor Continues Its Pricing Differentiation Strategy to Gain Market Share.**

Customers informed Immucor on January 10, 2008 that Ortho's prices were increasing by 100%.  JA-3402 (Jan. 2008 Heflin E-mail).  Immucor awarded another bounty to the first employee who was able to obtain from a customer Ortho's letter and price list.  JA-3403 (Jan. 2008 Otis E-mail); JA-3404 (Jan. 2008

Pothier E-mail).  Once again, Immucor decided it would not match Ortho's price increases.  JA-3405-06 (Apr. 2008 De Chirico E-mail).  Instead, in July 2008, several months after Ortho's increase, Immucor implemented a smaller price increase to customers in its top tiers.  JA-3407 (Mar. 2008 Immucor Customer Letter).  As was the case with the earlier price increases, the timing of Ortho's and Immucor's price increases in 2008 differed.  JA-4185, JA-4240 (Bronsteen Report).

    With each successive price increase after the market became a duopoly in 1999, the price gap between the two remaining suppliers of blood reagents grew.



**Exhibit 9A**
**Average Monthly Price**

Sources: Ortho sales data processed by Dr. Beyer (ortho_trad_reagent_dataset.sas7bdat); Immucor sales data processed by Dr. Beyer (im_stacked_transaction.sas7bdat); IMMUCOR00043223; IMMUCOR00043888; IMMUCOR00073027; IMMUCOR00171076; IMMUCOR00197288; IMMUCOR00197290; ORTHOCD-0024345 - 24346; ORTHOCD-0607300 - 607305; ORTHOCD-0666349 - 666352.

JA-4244, JA-4188-90, JA-4245-47 (Bronsteen Report).  By 2008, Immucor's prices to preferred customers were generally less than half of Ortho's prices.  JA-3421 (Immucor Customer Presentation).

The disparity in prices is also manifested by the increase in Immucor's market share by revenue from 56% before the start of the proposed class period to more than 72% by 2007.  *See* JA-929-30 (Beyer Report).  As the chart below reflects, the large shift of customers during the same time period from Ortho to Immucor is even more apparent when volume-based market share data are used.



JA-4190, JA-4249, JA-4250-52 (Bronsteen Report).

### D.    Plaintiffs' Expert Report on Economics.

Plaintiffs' economic expert, Dr. Beyer, has served as an expert witness in at least thirty-five antitrust class actions on behalf of a putative class of purchasers. *See* JA-973-85 (Beyer Report).  Among them, Dr. Beyer was the plaintiffs' expert in the *Hydrogen Peroxide* and *Plastics Additives* antitrust litigations.  This Court vacated and remanded the class certification order in *In re Hydrogen Peroxide Antitrust Litigation* because, among other reasons, Dr. Beyer's and the plaintiffs' representations that they "intend[ed] or plan[ed] to" – or had made a "threshold showing" of how they would – prove impact were insufficient.  552 F.3d 305, 318, 321 (3d Cir. 2008).  The *Hydrogen Peroxide* case settled before the district court could reconsider its certification opinion.  However, on remand in *In re Plastics Additives Antitrust Litigation*, the district court denied class certification because Dr. Beyer's opinions could not be used to demonstrate common impact.  No. 03-CV-2038, 2010 U.S. Dist. LEXIS 90135, at *72 (E.D. Pa. Aug. 31, 2010).[7]

In reaching his opinions on impact and damages here, Dr. Beyer has assumed many of the same general market characteristics that were insufficient as common proof in *Hydrogen Peroxide* and *Plastics Additives*.  *See* JA-947-48, JA-

---

[7] Dr. Beyer boasted at his deposition in this case that the Third Circuit's decision in *Hydrogen Peroxide* changed his view "[n]ot at all" about what Plaintiffs must present in the form of common economic proof.  JA-3512-13.

949-50 (Beyer Report).  Also, in lieu of established economic techniques, such as

"before and after" price comparisons and multiple regression, Dr. Beyer has

proffered four "benchmark" methodologies based on his interpretation of the 1999

OCV business plan.[8]  JA-4282-4310 (Beyer Reply Report).

## SUMMARY OF ARGUMENT

The district court erred by not subjecting Plaintiffs' economic proof to the

rigorous analysis required at the class certification stage.  Given the facts of this

case, Plaintiffs faced a "particularly difficult" burden identifying an economic

model capable of disaggregating any price increase due to the alleged conspiracy

from non-conspiratorial market effects.  JA-40 (Mem.).  That is because the market

for traditional blood reagents, after years of falling prices and consolidation,

became a duopoly in 1999, "only a short time before [Defendants] allegedly

conspired to fix prices."  *Id.*  Thus, as the district court found, prices for traditional

blood reagents were expected to rise in the more concentrated, post-1999 market,

"even in the absence of coordinated conduct."  *Id.*

In place of regression and other established empirical techniques, Plaintiffs

and Dr. Beyer proffered an economic model that was incapable of making a

---

[8] Dr. Beyer labels his four benchmark methodologies as "Benchmark I,"
"Benchmark II," or an "alternative" to each of those benchmarks.  Because all four
methodologies use the same OCV benchmark for the first half of the class period,
Ortho refers to them collectively as Dr. Beyer's "model" or his "methodology."

reliable distinction between duopoly and conspiratorial price effects. Among other deficiencies identified by Ortho and Dr. Bronsteen, the proposed model did not adequately account for changes in standard costs of production, demand, and market structure. The result was an unreliable, unscientific, and ad hoc approach to antitrust impact and damages that even the district court recognized at the class certification stage as having "some deficiencies." *See* JA-44.

Nevertheless, despite acknowledging "some force" to Ortho's criticisms of Dr. Beyer's model, the district court erroneously held that it "must defer" further analysis until the summary judgment stage. *See* JA-39. Citing this Court's decision in *Comcast Corp. v. Behrend*, 655 F.3d 182, 206 (3d Cir. 2011), *rev'd* 569 U.S. __, 133 S. Ct. 1426 (2013), the district court justified its deferral of Ortho's arguments on the basis that they "go to the merits of the models Dr. Beyer has constructed: the question whether the model[] give[s] rise to a 'just and reasonable inference or [is] speculative.'" JA-39.

The district court's decision to defer analysis of Dr. Beyer's model as premature on the grounds that Ortho's challenges to the model raised "merits" or "reliability" issues represents a reversion to the less rigorous, conditional class certification analysis that pre-dated this Court's *Hydrogen Peroxide* opinion and the 2003 amendments to Federal Rule of Civil Procedure 23. An assessment of the merits and reliability of Plaintiffs' economic proof is part of the rigorous analysis

mandated by this Court. *See Hydrogen Peroxide*, 552 F.3d at 316 ("[a]n overlap between a class certification requirement and the merits of a claim is no reason to decline to resolve relevant disputes").

Any doubt that the district court's decision to defer further analysis was out of step with current standards of class certification was resolved by the Supreme Court in *Comcast*. In reversing this Court's judgment in *Comcast*, the Supreme Court squarely rejected the proposition that arguments against economic proof should not be addressed at the class certification stage simply because they are also pertinent to "merits" determinations. 133 S. Ct. at 1432-33.

The district court also erred when it adopted at the class certification stage Plaintiffs' overly narrow standard of antitrust impact, which would negate any consideration of the net effect of the alleged conspiracy on the class members' total purchase price for blood reagents.

Finally, the district court committed error by certifying a class that includes thousands of fraudulent concealment claims, without requiring Plaintiffs to present any trial plan for resolving these individual claims on a manageable basis. By deferring consideration of individual issues of notice and due diligence until a later "damages phase" if necessary, the district court failed to address the changes in the law brought about by the 2003 amendments to Rule 23. *See, e.g.*, Fed. R. Civ. P. 23(c)(1)(B); *Wachtel v. Guardian Life Ins. Co.*, 453 F.3d 179, 185 (3d Cir.

2006).  The prevalence of individual issues of fraudulent concealment, like individual damages issues, must be considered at the class certification stage.  *See Comcast*, 133 S. Ct. at 1432-33.

## STANDARD AND SCOPE OF REVIEW

This Court reviews the district court's order granting class certification for abuse of discretion, which occurs if "the district court's decision 'rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact.'"  *Hydrogen Peroxide*, 552 F.3d at 312 (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 165 (3d Cir. 2001)).  The de novo standard of review applies in determining "whether an incorrect legal standard" has been used by the district court at the class certification stage.  *Id.* "Since 'each requirement of Rule 23 must be met, a district court errs as a matter of law when it fails to resolve a genuine legal or factual dispute relevant to determining the requirements.'"  *In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 779 (3d Cir. 2009) (quoting *Hydrogen Peroxide*, 552 F.3d at 320).

The district court's Class Certification Order is subject to de novo review on the legal questions of whether it improperly deferred its analysis of the merits and reliability of Dr. Beyer's model, whether it improperly shifted the burden of proof on certain essential findings, whether it applied a legally incorrect standard of antitrust impact, and whether it erred in not assessing the individual issues of

fraudulent concealment.  The district court, in conjunction with these legal errors, abused its discretion by accepting a model of impact and damages that was unscientific, speculative, and ad hoc.

A court addressing class certification issues "must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits— including disputes touching on elements of the cause of action." *Hydrogen Peroxide*, 552 F.3d at 307.  Plaintiffs must provide more than a "threshold" showing; they must prove, by a preponderance of the evidence, that all of the requirements of Rule 23 are met. *Id.* at 307, 316 n.14, 320; *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. __, 131 S. Ct. 2541, 2551 (2011).

In evaluating whether antitrust plaintiffs have satisfied the Rule 23(b)(3) predominance requirement, the district court must conduct a "rigorous assessment of the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove impact at trial." *Hydrogen Peroxide*, 552 F.3d at 311-12. Expert opinions on impact and damages, like other evidence offered by plaintiffs in support of class certification, are subject to rigorous analysis, which entails "[w]eighing conflicting expert testimony," *id.* at 323, and a standard of review comparable to that in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Wal-Mart*, 131 S. Ct. at 2553-54.

**ARGUMENT**

I.    **THE DISTRICT COURT ERRED WHEN IT DEFERRED ITS ASSESSMENT OF THE MERITS AND RELIABILITY OF DR. BEYER'S MODEL, AND WHEN IT SHIFTED THE BURDEN OF PROOF TO ORTHO ON OTHER ISSUES ESSENTIAL TO A FINDING OF COMMON PROOF.**

To satisfy their burden under Rule 23(b)(3), antitrust plaintiffs must "demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Hydrogen Peroxide*, 552 F.3d at 311-12 (citations omitted). Plaintiffs are not required to prove the elements of their case at the class certification stage. *See, e.g.*, *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 568 U.S. __, 133 S. Ct. 1184 (2013). However, evaluating proof of the essential element of antitrust impact at this stage of an antitrust case is "critically important" in determining whether Rule 23's predominance requirement has been met. *Hydrogen Peroxide*, 552 F.3d at 311; *see also id.* at 323 ("[O]pinion testimony should not be uncritically accepted as establishing a Rule 23 requirement merely because the court holds the testimony should not be excluded, under *Daubert* or for any other reason.").

Plaintiffs, as is often the case in antitrust class actions, have relied on their economic expert in attempting to satisfy this predominance requirement. *See, e.g.*, *In re Chocolate Confectionary Antitrust Litig.*, MDL No. 1935, 2012 U.S. Dist.

LEXIS 174681, at *51-52 (M.D. Pa. Dec. 7, 2012).  As such, the testimony of

Dr. Beyer is "integral to the court's determination of whether the [plaintiffs] can

both prove and quantify their antitrust injury with evidence common to the class.

Hence, the court must evaluate the reliability and fitness of the proffered testimony

of [plaintiffs' experts]." *Id.*

Here, despite identifying "some deficiencies" with Dr. Beyer's methodology

and finding "some force" to Dr. Bronsteen's criticisms, the district court deferred

further analysis of the proof of antitrust impact and damages, reasoning that it did

not need to determine at the class certification stage whether the model is a "just

and reasonable inference or speculative."  JA-38 (citing *Comcast*, 655 F.3d at 206).

By doing so, the district court's analysis fell well short of the rigorous assessment

required by *Hydrogen Peroxide*.  *See* 552 F.3d at 311-12.  On other issues, it

improperly shifted the burden to Ortho to disprove antitrust impact and damages.

The district court, therefore, erred as a matter of law.

## A.    At the Class Certification Stage, the Court Is Required to Evaluate Merits and Reliability Issues in Determining Whether Common Proof of Impact and Damages Is Available.

Plaintiffs had a "particularly difficult" task here in estimating but-for prices

because the change to a duopoly market structure coincided with the start of the

alleged conspiracy.  *See* JA-40 (Mem.).  For the same reason, traditional economic

methods for establishing impact and damages, such as "before and after" and

"multiple regression," were not available.  *Id.*  In lieu of such established economic

methodologies, Plaintiffs and Dr. Beyer proffered a model based on hearsay

statements in select Ortho business plans, which Ortho challenged as unscientific,

speculative, and ad hoc.  *E.g.*, JA-4742-43.

Rather than addressing Ortho's challenges to the merits and reliability of

Dr. Beyer's model, the district court deferred such an analysis until a later stage of

the case, citing repeatedly to this Court's decision in *Comcast* to justify deferring

consideration of Ortho's criticisms.  *See* JA-38, JA-39, JA-42-43, JA-44-46, JA-

48.  The district court reasoned that an analysis of the "merits" of Dr. Beyer's

model was inappropriate because arguments going to the reliability of the model

did not present individualized questions.  *E.g.*, JA-39, JA-42-43, JA-44-46, JA-48.

The district court claimed it had not "reached the stage of determining on the

merits whether [Dr. Beyer's] methodology is a just and reasonable inference or

speculative," and his model did not need to be "perfect" as long as it "could evolve

to become admissible evidence."  JA-38 (quoting *Comcast*, 655 F.3d at 204 n.13,

206).  To the district court, all that mattered was that Dr. Beyer's methodology was

common.  *See* JA-39.

This approach, however, is inconsistent with this Court's guidance,

articulated in *Hydrogen Peroxide*, that evidence of impact is subject to a rigorous

assessment at the class certification stage.  552 F.3d at 323.  Further, this approach

– deferring an analysis of "whether the methodology [was] a just and reasonable inference or speculative" and only considering whether proof of impact was common – was explicitly rejected by the Supreme Court in *Comcast*.  133 S. Ct. at 1433.  As explained by the Supreme Court, "[u]nder that logic, at the class certification stage *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be.  Such a proposition would reduce Rule 23(b)(3)'s predominance requirement to a nullity." *Id.*

Among other things, the district court should have addressed the question it explicitly avoided:  whether the models were a just and reasonable inference or speculative.  *See* JA-38 (Mem.).  The district court ran afoul of Supreme Court and Third Circuit precedent "[b]y refusing to entertain arguments against [Plaintiffs'] damages model that bore on the propriety of class certification, simply because those arguments would also be pertinent to the merits determination."  *Comcast*, 133 S. Ct. at 1432-33; *Hydrogen Peroxide*, 552 F.3d at 316-18.

In assessing whether expert testimony offered at the class certification stage is reliable and will be admissible at trial, several appellate and district courts have held that the requirement of rigorous analysis entails conducting a *Daubert* level of

review at the class certification stage.[9]  *See, e.g.*, *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 n.6 (5th Cir. 2005) ("In order to consider Plaintiffs' motion for class certification with the appropriate amount of scrutiny, the Court must first determine whether Plaintiffs' expert testimony supporting class certification is reliable."); *Chocolate Confectionary*, 2012 U.S. Dist. LEXIS 174681, at *51 ("[T]he court finds that a thorough *Daubert* analysis is appropriate at the class certification stage of this MDL in light of the court's responsibility to apply a 'rigorous analysis' to determine if the putative class has satisfied the requirements of Rule 23.").  Other courts have adopted a "focused" *Daubert* standard.  *See, e.g.*, *In re Zurn Pex Plumbing Prods. Litig.*, 644 F.3d 604, 613-14 (8th Cir. 2011).  While both these levels of *Daubert* review – full and focused – stem from the obligation to conduct a rigorous analysis of economic proof at the class stage, the district court applied no level of scrutiny to the merits and reliability of Dr. Beyer's model.  Instead, the court deferred any such consideration until the summary judgment stage.

---

[9] Although the Supreme Court has not yet squarely addressed the extent to which rigorous analysis entails a full *Daubert* standard of review at the class certification stage, it has signaled to the lower courts that they should conduct such an analysis: "The District Court concluded that *Daubert* did not apply to expert testimony at the certification stage of class-action proceedings.  We doubt that is so . . . ."  *Wal-Mart*, 131 S. Ct. at 2553-54 (internal citation omitted).

The district court also cited case law that applied a "relaxed" standard to proof of damages.  *See* JA-38 (citing *McDonough v. Toys "R" Us, Inc.*, 638 F. Supp. 2d 461, 490 (E.D. Pa. 2009), which reasoned:  "An antitrust plaintiff must make a showing regarding the amount of damages, but the standard of proof is somewhat relaxed." (internal quotation marks and citation omitted)).  That was error for two reasons.  First, to the extent it was ever the law that a relaxed standard could be applied to proof of damages, such a relaxed standard would not be appropriate in this case because Dr. Beyer's "damages" methodology was also proffered by Plaintiffs as common proof of impact.  In fact, Dr. Beyer's "damages" methodology was the only element of Plaintiffs' common proof that even purported to distinguish between lawful duopoly pricing and unlawful price fixing.  Second, the Supreme Court held in *Comcast* that a class cannot be certified if plaintiffs do not present a model that establishes damages can be measured on a class-wide basis.  133 S. Ct. at 1433.  The Supreme Court criticized this Court's refusal to entertain arguments against the damages model.  *Id.* at 1432-33.  The district court thus committed error in this case by not applying the requisite rigorous analysis, regardless of whether Dr. Beyer's economic model is proffered as common proof of impact or common proof of damages, or both.

### B. Dr. Beyer's Model Does Not Withstand the Rigorous Analysis that the District Court Should Have Applied.

Plaintiffs must proffer common evidence that they paid higher prices than they would have paid "but for" the alleged price-fixing conspiracy. *Comcast*, 133 S. Ct. at 1433-34; *see also* JA-3503 (Beyer Dep.). This distinction between evidence of higher prices and proof of antitrust impact is especially important here, because the beginning of the alleged conspiracy, January 1, 2000, coincided with a significant change in market structure – the consolidation of the market to a duopoly. This concurrence of events makes the estimation of but-for prices "particularly difficult" because "[m]arket consolidation tends to increase prices, even in the absence of coordinated conduct." *See* JA-40 (Mem.).

At his deposition, Dr. Beyer conceded that Plaintiffs must find "a way of distinguishing . . . price changes that can be the result of the market power of a duopoly on the one hand and price increases that are caused by conspiratorial activity on the other." JA-3607.[10] The district court's failure to hold Plaintiffs to their burden of demonstrating that Dr. Beyer's model was capable of making this distinction in price effects is reversible error.

---

[10] This is consistent with the Supreme Court's recent observation of the "unremarkable premise" that Plaintiffs' model must measure only damages attributable to the conspiracy, not other changes in the market. *Comcast*, 133 S. Ct. at 1433.

1.     **Dr. Beyer's Methodology Is Unscientific and Unreliable Because It Is Not Based on Data or Documents Reasonably Relied upon by Economists.**

Instead of well-established economic techniques using empirical data, Dr. Beyer's "benchmark" methodology relies entirely on his subjective interpretation of hearsay statements in Ortho's OCV business plan.  Dr. Bronsteen testified and Ortho argued that this methodology was unscientific and ad hoc because economists cannot substitute judgments made in business plans for their own "informed economic analysis."  JA-409-10, JA-414 (Class Cert. Hr'g Tr.).

Plaintiffs cited no authority for the proposition that an expert could base a benchmark solely on business plans or that this methodology is generally accepted in the field of economics.  To the contrary, courts have rejected Dr. Beyer's and other experts' ad hoc reliance on business plans.  *See, e.g.*, *Plastics Additives*, 2010 U.S. Dist. LEXIS 90135, at *20, *44-45 (criticizing Dr. Beyer for relying on business plans instead of empirical analysis and describing his opinion as "nothing more than a repetition of unexplained conclusions").[11]

"'[A]n expert must vouchsafe the reliability of the data on which he relies and explain how the cumulation of that data was consistent with standards of the

---

[11] *See also In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 995-96 (C.D. Cal. 2012) (finding that expert's subjective determination of which "industry materials" to rely on and corresponding lack of any discernible economic analysis of those materials render market analysis unreliable).

- 34 -

expert's profession.'" *Lantec, Inc. v. Novell, Inc.*, No. 2:95-CV-97, 2001 U.S.

Dist. LEXIS 24816, at *25 (D. Utah Feb. 13, 2001) (quoting *SMS Sys. Maint.*

*Servs. v. Digital Equip. Corp.*, 188 F.3d 11, 25 (1st Cir. 1999)).  Without

understanding the data or methodology relied on by the author of a business

document, an expert cannot demonstrate that "reliance on internal documents from

a company are 'of a type reasonably relied upon by experts in the particular field in

forming opinions or inferences upon the subject'" as required by Federal Rule of

Evidence 703.  *Id.* at *26.  Dr. Beyer's consistent reliance on "anecdotal evidence"

from business plans instead of empirical analysis has led to "haphazard testimony"

that frequently is rejected by courts.  *Id.* at *27; *see also Plastics Additives*, 2010

U.S. Dist. LEXIS 90135, at *45 ("Since Dr. Beyer's opinion is nothing more than a

repetition of unexplained conclusions, we cannot afford it much weight.").

     After the district court issued its decision on class certification here, this

Court rejected expert testimony that relied upon a business plan to estimate "but-

for" revenues in *ZF Meritor, Inc. v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012).

There, this Court confirmed that district courts must perform a case-by-case

inquiry – including an inquiry into the methodology used to create the business

plan and the assumptions on which it was based – to determine whether an expert's

reliance on a business plan is reliable.  *Id.* at 292-93.  Here, the district court did

not conduct such an inquiry or require Plaintiffs to demonstrate that Dr. Beyer

knew anything about the methodology and assumptions on which OCV was based. Instead, the district court erred by dismissing all challenges to the merits and reliability of Dr. Beyer's model, on the grounds that it had "'not reached the stage of determining on the merits whether the methodology is a just and reasonable inference or speculative.'"  *See* JA-46 (quoting *Comcast*, 655 F.3d at 206).  This is precisely the approach rejected by the Supreme Court in *Comcast* as reducing Rule 23's requirements to a "nullity."  133 S. Ct. at 1433.  Further, the district court's failure to address Dr. Bronsteen's criticisms of Dr. Beyer's reliance on OCV ignores this Court's directive in *Hydrogen Peroxide* to resolve disputes between experts at the class certification stage.  552 F.3d at 324.

### 2. The District Court Improperly Shifted to Ortho the Burden of Proving that It Adopted the BBLP Before the Start of the Alleged Conspiracy.

Even if Dr. Beyer's reliance on his subjective interpretation of Ortho's business documents was permissible, his selection of the OCV plan was arbitrary and speculative.  Dr. Bronsteen testified that Ortho's BBLP met all of the criteria that Dr. Beyer articulated for selecting OCV as his price benchmark:  (1) it post-dates the formation of a duopoly market; (2) it is set forth in contemporaneous business documents; and (3) it pre-dates the formation of the alleged conspiracy. JA-420-21 (Class Cert. Hr'g Tr.).  Indeed, Dr. Beyer concedes that his selection of business documents to rely upon was dependent upon whether they were generated

by the company before or after Plaintiffs' start date for the alleged conspiracy.  JA-3540-41 (Beyer Dep.).

Yet, Dr. Beyer does not adequately explain why, given his assumption that the conspiracy began in November 2000, he relied on OCV and disregarded the BBLP.  The business documents relating to the BBLP make clear that Ortho adopted its plan for a more significant "market correction" in September and October 2000, before the alleged conspiracy's start date.[12]  In BBLP price plans dated September 15, 2000 and October 30, 2000, Ortho explained that the amount of the increase would range from 46% to 202%, depending on the prices paid by the customer before the increase.  JA-2626 (Oct. 2000 Ortho BBLP Presentation); JA-2939 (Sept. 2000 Ortho Traditional Blood Bank Market Correction Plan Presentation).  The amounts of the customer-specific price increases in both documents are identical, and the prices listed in the October document are nearly identical to the prices set forth in Ortho's November 21, 2001 price list,

---

[12] Plaintiffs assert that the pricing in the BBLP plan did not go into effect until after the alleged conspiracy began in November 2000.  But that is a distinction without a difference, for two reasons.  Both OCV (the source of Dr. Beyer's benchmark) and BBLP were price plans that were adopted before the conspiracy allegedly started and set forth future price increases to go into effect in 2001.  Second, on cross-examination, Dr. Beyer admitted that a price plan could be considered "implemented" even before the customer was actually invoiced with the higher prices.  JA-787-88 (Beyer Class Cert. Hr'g Testimony) ("[A] price had to be reflected in a framework document for the customer, contract, voice understanding, however they did it.").

demonstrating that Ortho had already decided on the amount of its 2001 price increase by September 15, 2000. JA-4176 (Bronsteen Report). Ortho began discussing the price increase with customers in September 2000. JA-2627 (Oct. 2000 Ortho BBLP Presentation).

The district court acknowledged that Plaintiffs introduced no evidence about the nature of Ortho's September 2000 customer communications, but stated that "[o]n the present state of the record," **Ortho** had not established when the plan was communicated to customers. JA-14. The only evidence in the record supported a finding that the plan was communicated to customers before November 2000. *See, e.g.*, JA-2627 (Oct. 2000 Ortho BBLP Presentation). Moreover, in shifting the burden of proof to Ortho, the district court ignored this Court's guidance in *Hydrogen Peroxide* that Plaintiffs bear the burden of proving the requirements of Rule 23 are met by a preponderance of the evidence. 552 F.3d at 316 n.14. Instead, the district court allowed Dr. Beyer to "cherry-pick" only the Ortho business documents most helpful to Plaintiffs, which is an unscientific practice of his that in the past has drawn significant criticism from other courts.[13]

---

[13] *See, e.g.*, *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp., L.P.*, 247 F.R.D. 156, 173 (C.D. Cal. 2007) (criticizing Dr. Beyer for "cherry-pick[ing]" from documents "the predictions and conclusions most consistent with and helpful to Plaintiffs' theory of the case, ignoring equally reliable predictions and conclusions found in the very same internal documents"); *Lantec*, 2001 U.S. Dist.

(continued…)

The district court further erred by concluding that substituting BBLP for OCV would affect only the amount of damages and was therefore a merits issue. JA-45. This ignores Dr. Bronsteen's testimony that if BBLP prices were substituted for OCV prices, it would "dramatically" change Dr. Beyer's conclusions about antitrust impact. JA-422-23 (Class Cert. Hr'g Tr.). A finding by the district court on the timing of the BBLP was, therefore, required – even if this issue overlaps with the merits – and is one of the essential components missing from the district court's analysis of Dr. Beyer's model. *Hydrogen Peroxide*, 552 F.3d at 307 ("[T]he court must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits.").

### 3. Dr. Beyer's Application of His "Benchmark" Methodology Was Also Ad Hoc and Speculative.

Dr. Beyer's methodology is also ad hoc and speculative because, in his Reply Report, he shifted the start date of his predicted but-for price increases from 2000 to 2001. In his Initial Report, Dr. Beyer increased but-for prices by 25% in 2000, JA-966, because his benchmark was supposedly based on Ortho's "own projection of the but-for prices," JA-965. In his Reply Report, Dr. Beyer shifted the start of but-for price increases from 2000 to 2001, even though the 2001 start

---

(…continued)

LEXIS 24816, at *26-27 (describing Dr. Beyer's reliance on business records as "haphazard").

date was inconsistent with the April 2000 price increase planned for in the OCV plan that Dr. Beyer claims to rely upon as his pricing benchmark.  JA-2927-29 (Ortho OCV Summary Memo); JA-2930-31 (Ortho OCV SOP); JA-4296-97 (Bronsteen Report); *see also* JA-415-16 (Class Cert. Hr'g Tr.).  Dr. Beyer acknowledged that he moved the start date forward in order to reduce the number of reagents with actual prices that were below his but-for prices between 2000 and 2004.  JA-4313-15 (Beyer Reply Report).

Courts have explicitly rejected an expert's reliance on a business plan that is contradicted by actual results.  *See, e.g.*, *Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 682 (3d Cir. 1991) ("We too have serious reservations about the validity of expert testimony based on prior predictions of sales for a given period when actual performance data for that same time span are available."); *JMJ Enters., Inc. v. Via Veneto Italian Ice, Inc.*, No. 97-CV-652, 1998 U.S. Dist. LEXIS 5098, at *22-23 (E.D. Pa. Apr. 15, 1998) (excluding expert testimony because it did not bridge the gap between actual sales and projections).  Here, Dr. Beyer did not even adhere faithfully to the one pre-November 2000 Ortho plan – OCV – that is the foundation for each of the proposed benchmarks in his model.[14]

---

[14] The unreliable and ad hoc nature of Dr. Beyer's approach to antitrust impact and damages is also illustrated by his decision to abandon his initial plan of calculating different but-for prices for different groups of customers.  *See* JA-3606-08 (Beyer Dep.).  In his Reply Report, Dr. Beyer chose to estimate only one "but-for" price

(continued…)

### 4. The District Court Did Not Make a Necessary Finding on Whether Dr. Beyer's Failure to Account for Demand and Cost Had a Material Effect on His Economic Model.

Dr. Bronsteen criticized Dr. Beyer's model for failing to account for the basic economic factors that economists use to predict prices:  demand, costs, and changes in market structure.  JA-409-19 (Class Cert. Hr'g Tr.).  In particular, Dr. Beyer's proposed benchmark methodology fails to account for (1) increases in costs, and (2) changes in demand for the entire damages period.  Even though the district court recognized that these omissions represented "some deficiencies," JA-44, and found Dr. Bronsteen's criticisms "persuasive," JA-45, it erred by deferring any further analysis of the missing factors.

---

(…continued)

for each product for each year, even though there was significant price dispersion in the real world.  *See* JA-439, JA-445 (Class Cert. Hr'g Tr.); *see also* JA-864-66 (Beyer Class Cert. Hr'g Testimony).  The district court should not have excused Dr. Beyer's failure to create a realistic model on the basis that it would "exponentially complicate the calculation of damages."  JA-43 (Mem.); *see also* *Hydrogen Peroxide*, 552 F.3d at 310 ("[T]he decision on class certification may implicate highly fact-based, complex, and difficult matters." (internal quotation marks and citation omitted)).

Dr. Bronsteen testified that accounting for cost increases would have significantly changed Dr. Beyer's predicted but-for prices because Dr. Beyer's empirical data show that standard costs rose significantly year over year from 2001 through 2004 as shown below:

| Company | 2001 | 2002 | 2003 | 2004 |
|---------|------|------|------|------|
| Immucor | 18% | 23% | 25% | 25% |
| Ortho | 26% | 13% | 34% | 31% |

JA-633 (Bronsteen Class Cert. Presentation); *see also* JA-424-25 (Class Cert. Hr'g Tr.); JA-4174, JA-4229-30 (Bronsteen Report).  Dr. Bronsteen further testified that if Dr. Beyer had accounted for costs in the first five years of the damages period, that would have had a "huge impact" on his conclusions about impact, and in many cases would have "wipe[d] it out" entirely.  JA-425-26.[15]  Similarly, accounting for growth in demand would also have increased Dr. Beyer's predicted but-for prices. Demand for blood reagents is influenced by the number of units of blood donated and the number of units of blood transfused, which Dr. Beyer acknowledges

---

[15] Dr. Beyer's failure to account for increases in costs is particularly problematic because the 1999 OCV business plan he relies upon as his benchmark assumes – contrary to the market reality from 2000 through 2005 – that costs would remain constant.  JA-424 (Class Cert. Hr'g Tr.); JA-2785 (Dec. 1999 Ortho Project Create Value Update).

increased by at least 28% and 22%, respectively, during the class period.  JA-4173
(Bronsteen Report).

Courts have repeatedly rejected economic analysis, including analysis by
Dr. Beyer, that fails to account for market factors not attributable to the alleged
misconduct, on the basis that it is unreliable.  *See, e.g.*, *Blue Cross & Blue Shield
United v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) ("Statistical studies
that fail to correct for salient factors, not attributable to the defendant's
misconduct, that may have caused the harm of which the plaintiff is complaining
do not provide a rational basis for a judgment."); *Lantec*, 2001 U.S. Dist. LEXIS
24816, at *19-20 (criticizing Dr. Beyer for "fail[ing] to address in sufficient
manner or degree salient factors not attributable to the defendant's alleged
wrongdoing that may have caused the harm alleged," such as the nature of the
"rapidly changing and growing market").  By also foregoing an analysis of the
missing cost and demand factors as premature on the grounds that Ortho's
challenges to Dr. Beyer's model raised "merits" issues, the district court failed to
meet its obligation to conduct a rigorous analysis of the model, and to weigh his
testimony against that of Dr. Bronsteen.  *Comcast*, 133 S. Ct. at 1432; *Hydrogen
Peroxide*, 552 F.3d at 307, 323-24.

### 5.     The District Court Erred by Deferring Analysis of Dr. Beyer's RhoGAM Benchmark.

To predict post-2006 blood reagent prices, Dr. Beyer relied, in part, on the pricing of another product line sold by Ortho, RhoGAM, a pharmaceutical that prevents hemolytic disease in newborns and that competes with other Rho(D) pharmaceuticals.  JA-4290-91 (Beyer Reply); JA-4256-57 (Kleinbard Declaration). The district court erred by deferring a rigorous analysis to this post-2006 price benchmark as well.

Dr. Bronsteen opined that RhoGAM was not an appropriate benchmark because Plaintiffs have not demonstrated that the cost, demand, and competition levels in the Rho(D) market were comparable to those in blood reagents market. JA-4167-70; *see also Eleven Line, Inc. v. N. Tex. State Soccer Ass'n*, 213 F.3d 198, 208 (5th Cir. 2000) ("An antitrust plaintiff who uses a yardstick method of determining lost profit bears the burden to demonstrate the reasonable similarity of the business whose earning experience he would borrow."); *Home Placement Serv., Inc. v. Providence Journal Co.*, 819 F.2d 1199, 1206-07 (1st Cir. 1987) (same).

During the late 1990s, blood reagents prices were declining while Rho(D) prices were increasing, by as much as 382%.  Dr. Bronsteen explained that these different price movements demonstrate that the markets are influenced by different cost, demand, and competition factors.  JA-4167-68.  Moreover, the two markets

had different levels of competition during the class period. There were three competitors in the Rho(D) market beginning in 2004, but only two in the blood reagents market. JA-4168-69. The FTC found the distinction between two and three competitors to be significant enough to challenge a proposed merger between two Rho(D) competitors. JA-4169.

The district court acknowledged that Ortho pointed out "important differences" between the blood reagents and Rho(D) markets and that it was "not entirely persuaded" by Dr. Beyer's explanation for why he used RhoGAM as a benchmark only for the period when there were three competitors in the Rho(D) market. JA-48 n.15. The district court, nevertheless, deferred further analysis of this issue, stating that Ortho's criticisms were not "so fundamental that the models could not 'evolve to become admissible evidence.'" JA-48. This determination, however, is directly contrary to this Court's instruction in *Hydrogen Peroxide* that "courts should not rely on later developments to determine whether certification is appropriate." 552 F.3d at 320 (citing 5 Moore's Federal Practice § 23.80[2]). It also falls short of the rigorous analysis the district court must conduct at the class certification stage. *See Comcast*, 133 S. Ct. at 1432; *Hydrogen Peroxide*, 552 F.3d at 309.

**C.    The Remaining Elements of "Common Proof" Proffered by Plaintiffs Fail to Distinguish Between Supra-Competitive Pricing from the Duopoly and from the Alleged Price-Fixing Conspiracy.**

The district court erred in accepting one of the remaining four elements of "common proof" proffered by Plaintiffs – Dr. Beyer's "market structure analysis" – as "persuasive evidence" of impact.  JA-33.[16]  Specifically, the district court cited Dr. Beyer's opinion on the characteristics of the blood reagents market: (1) consolidated; (2) high barriers to entry; (3) inelastic demand; (4) interchangeability of products; (5) Defendants' ability to monitor each other's pricing; and (6) Defendants' unwillingness to deviate from their pricing policies. JA-29-30.  These market characteristics, either individually or collectively, are incapable of proving impact or damages.

As Dr. Bronsteen opined, even if Dr. Beyer's description of the traditional blood reagent market were accurate, this market structure in the context of a

---

[16] The district court acknowledged that the other three elements did not establish antitrust impact:  First, Dr. Beyer's "empirical pricing analysis" demonstrates only that prices increased.  The district court acknowledged that this analysis was not sufficient to demonstrate impact.  JA-33.  Likewise, the "Defendants' documents" element was used only to show that prices increased, not that they were higher than the but-for price.  The district court found that this element did not suffice to prove impact on its own.  JA-35.  Finally, as Plaintiffs conceded and the district court noted, the *Bogosian* shortcut is not sufficient, by itself, to establish the predominance requirement of Rule 23(b)(3).  *See* JA-28 (citing *Hydrogen Peroxide*, 552 F.3d at 326).  A presumption of impact would be particularly unwarranted in this case, when the prior change to a duopoly provides an alternative, non-conspiratorial explanation for the price increases.

duopoly is more likely to prompt price leadership by one of the two suppliers –
which is legal – than it is to prompt an illegal price-fixing conspiracy.  JA-406
(Class Cert. Hr'g Tr.); JA-4183-84; *see also Superior Offshore Int'l, Inc.
v. Bristow Grp.*, 490 F. App'x 492, 499-500 (3d Cir. 2012) (affirming summary
judgment because in an oligopolistic market "price increases could have just as
easily been the result of 'price leadership' as of price fixing"); *White v. R.M.
Packer Co.*, 635 F.3d 571, 578-79 (1st Cir. 2011) (affirming summary judgment
because similar market characteristics made it likely that each defendant would
"reach its own independent conclusion that its best interests involve keeping prices
high, including following price changes by a price 'leader.'").  Dr. Bronsteen
testified that the market structure suggests nothing about whether prices increased
because of lawful price leadership or a conspiracy and, therefore, is not evidence
that class members were impacted by a conspiracy.  JA-413-14 (Class Cert. Hr'g
Tr.).

    The district court deferred its analysis of this criticism of Dr. Beyer's market
structure by treating the criticism as raising a merits issue.  JA-31.  This misses the
point of Dr. Bronsteen's criticism:  Plaintiffs do not dispute that prices rose as a
result of the change to a duopoly market structure; Dr. Beyer's market structure
analysis fails because it does nothing to draw the line, if any exists, between that
lawful price increase and the actual prices observed.  As the Supreme Court

observed in *Comcast*, an economic model that is unable to "bridge the differences" between supra-competitive prices attributable to non-actionable conduct and those attributable to the actionable antitrust violation cannot satisfy Rule 23's requirements. 133 S. Ct. at 1435.

## II.    THE DISTRICT COURT ERRED BY ADOPTING AN INCORRECT STANDARD OF ANTITRUST IMPACT FOR PRICE-FIXING CASES.

The district court erred by accepting as a legal standard Dr. Beyer's opinion "that every purchaser that paid more for at least *one reagent* on at least one transaction during the Damage Period than it would have paid in the absence of the alleged anti-competitive conduct is considered to have been impacted." JA-4271 (Beyer Report) (emphasis added); JA-857-58 (Beyer Class Cert. Testimony). This erroneous standard would allow Plaintiffs to prove antitrust impact even in cases where the total but-for price for each transaction during the class period was above the actual transaction price.

### A.    Antitrust Impact Requires Each Plaintiff to Show that It Was Injured in Fact.

Antitrust impact is a distinct element that Plaintiffs must prove independent of the alleged anticompetitive conduct. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 343-44 (1990) ("[P]roof of a per se violation and of antitrust injury are distinct matters that must be shown independently." (internal quotation marks and citation omitted)). Even in price-fixing cases, where the conduct is per

se unlawful, each individual plaintiff must show that it was injured in fact.  *See id.*;

*Pace Elecs., Inc. v. Canon Computer Sys., Inc.*, 213 F.3d 118, 120 (3d Cir. 2000).

At the class certification stage, Plaintiffs and their expert failed to demonstrate that

this distinct element "is capable of proof at trial through evidence that is common

to the class."  *Hydrogen Peroxide*, 552 F.3d at 311.

 Where purchasers buy multiple products as part of a single transaction, as

blood reagent customers do, courts assess antitrust impact by looking at the net

effect of the alleged conduct on the price for the entire transaction.  *See, e.g.*,

*Kottaras v. Whole Foods Market, Inc.*, 281 F.R.D. 16, 25 (D.D.C. 2012), *appeal*

*denied sub. nom.*, No. 12-8003, 2012 U.S. App. LEXIS 8174 (D.C. Cir. Apr. 20,

2012); *Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 513-14 (S.D. Ill.

2004); *Kypta v. McDonald's Corp.*, 671 F.2d 1282, 1285 (11th Cir. 1982).

 In *Whole Foods*, the district court concluded that plaintiffs failed to

introduce sufficient common proof of antitrust impact arising from a merger.  281

F.R.D. at 18, 23-24.  Their expert's regression model did not account for any

benefits flowing to customers due to merger-created efficiencies, so there was "no

way of knowing what percentage of the proposed class ultimately suffered any net

injury."  *Id.* at 23-24.  The only way to determine which class members suffered

*net* harm "requires an analysis of each putative class member's purchases . . . and

the amount by which the price of each product changed as a result of the merger."

*Id.* at 25.  Because this analysis depends on the mix of products each customer purchased, which is an individualized inquiry that varies by customer, the court held that it would be impossible to determine impact by common proof.  *Id. Accord Exhaust Unlimited*, 223 F.R.D. at 513-14 ("[O]nly examination of individual customer contracts and invoices would determine whether a class member was injured.").

The district court attempted to distinguish *Whole Foods* by focusing on the nature of the merger conduct at issue.  *See* JA-36-37.  Other courts, however, including in case law cited by Ortho below,[17] have applied the same principle of antitrust impact outside the merger context.  For example, in assessing antitrust impact, courts have evaluated net effects in unilateral conduct cases.  *See Allen v. Dairy Farmers of Am. Inc.*, 279 F.R.D. 257, 271 (D. Vt. 2011) (finding expert failed to account for plaintiffs who may have benefitted from alleged monopolistic behavior); *Allied Orthopedic*, 247 F.R.D. at 170 (concluding that plaintiffs and their expert, Dr. Beyer, could not show common evidence of class-wide impact where they did not show how much a particular mix of sensors would cost in the actual world compared to the same mix in the but-for world).

---

[17] Ortho cited *Exhaust Unlimited* in its class certification briefing.  *See* JA-4748.

Courts have assessed net effects in price-fixing cases as well. In *Exhaust Unlimited*, the court considered whether customers showed common proof of impact due to an alleged price-fixing conspiracy and information exchange. 223 F.R.D. at 508. The total price comprised various charges and fees, only one of which was allegedly fixed. *Id.* at 513. The court declined to certify the class, concluding that an "individualized inquiry arises because customers who received compensating discounts or offsets . . . likely benefitted or were not affected by [the allegedly fixed] charges." *Id.* at 513-14. Further, the "impact of total invoice price would not be measurable without considering the particular mix of products and services covered by each invoice." *Id.* at 514. *Accord Kenett Corp. v. Mass. Furniture & Piano Movers Ass'n*, 101 F.R.D. 313, 316-17 (D. Mass. 1984) (finding allegedly fixed component of price could be offset by a number of factors where transaction was priced according to particular blend of services employed).[18]

### B.    The District Court Substituted a Lower Standard of Antitrust Impact for a Rigorous Analysis of Dr. Beyer's Model.

The district court was required to assess the adequacy of Dr. Beyer's model in terms of the impact of the conspiracy on the total transaction price because

---

[18] This principle applies with equal force even when there are only two products at issue. For example, in tying cases, courts consider the net effect of the alleged anti-competitive conduct on the entire transaction. *See Kypta*, 671 F.2d at 1285 ("[T]he fact of damage, consisting of net economic loss[, is] the gravamen of a tie-in-action.").

Plaintiffs typically purchase a mix of blood reagents. Indeed, throughout his expert reports, Dr. Beyer repeatedly stressed that members of the putative class purchased a mix from a "full line of reagents" from Defendants. *See, e.g.*, JA-4313-14 (Beyer Reply Report) ("customers generally need a full line of reagents"). Plaintiffs' industry expert, Ms. Harris, explained that this meant that customers would generally buy the reagents needed for tests required by the Food and Drug Administration, but that different class members would purchase different mixes of specialty reagents whose use was not mandated. JA-3736-37, JA-3825-26, JA-3880-83, JA-3925-26, JA-3928-29. For this reason, to be capable of proving injury in fact from the alleged antitrust violation, Plaintiffs must proffer more than proof that the price of one particular reagent, in a bundled transaction with other reagents, was higher than its estimated but-for price.

The district court excused Plaintiffs from their burden at the class certification stage by highlighting the nature of the conduct at issue – an alleged price-fixing conspiracy. JA-36 (citing *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 830 (3d Cir. 2010)). In effect, the district court collapsed what courts have recognized are distinct elements of a Sherman Act § 1 claim – an antitrust conspiracy and antitrust impact. *See Atl. Richfield Co.*, 495 U.S. at 344.

The district court compounded its error by excusing Plaintiffs' failure to account for nontraditional blood reagents in assessing the impact of the alleged

conspiracy.  This omission by Dr. Beyer in his model of antitrust impact was particularly significant, since more than half of the proposed class members and 77% of Ortho's customers were using nontraditional reagents by 2008, and transaction data showed that the pricing of nontraditional reagents was relatively flat throughout the class period.  JA-448-49 (Class Cert. Hr'g Tr.); JA-640-41 (Bronsteen Class Cert. Presentation); JA-2587 (Trinity Partners, LLC Q4 2008 Market Estimation).

The district court explained its decision not to assess the impact of nontraditional reagents by stating that "plaintiffs in this type of case should not be saddled with analyzing whether a price-fixing conspiracy might possibly have had any negative effect on the price of any product sold by the defendants."  *See* JA-37. Nontraditional blood reagents are not just "any product."  For a large segment of the proposed class, they are substitutes for traditional blood reagents.  Moreover, while Plaintiffs have limited their proposed class definition to direct purchasers of traditional blood reagents, the alleged conspiracy encompasses both traditional and nontraditional blood reagents.  JA-89-90, JA-94 (Complaint); JA-3542 (Beyer Dep.).  The complications the district court associated with such market effects were not a reason to excuse Dr. Beyer categorically from any analysis of nontraditional blood reagents.  *Hydrogen Peroxide*, 552 F.3d at 310.

By adopting Dr. Beyer's erroneous legal standard of antitrust impact, in lieu of a rigorous analysis of whether his model was capable of proving that the putative class members were injured in fact by the alleged price-fixing conspiracy, the district court committed additional error.

## III. THE DISTRICT COURT ERRED BY CERTIFYING A CLASS WITH THOUSANDS OF INDIVIDUAL FRAUDULENT CONCEALMENT CLAIMS, WHILE NOT REQUIRING PLAINTIFFS TO PRESENT ANY TRIAL PLAN FOR RESOLVING SUCH CLAIMS.

Issues relating to fraudulent concealment are central to this case, because half of Plaintiffs' claims for antitrust damages are time barred unless the applicable four-year statute of limitations is tolled. *See* 15 U.S.C. § 15b. Plaintiffs filed the first of their class action complaints on May 18, 2009, seeking damages dating back to January 1, 2001.[19] To avoid the limitations defense to their pre-May 18, 2005 damages claims, Plaintiffs must establish each of the three essential elements of fraudulent concealment: (1) defendants engaged in affirmative acts of concealment designed to mislead the plaintiffs regarding facts supporting their claim; (2) plaintiffs exercised reasonable diligence; and (3) plaintiffs were not aware, nor should they have been aware, of the facts supporting their claim until a

---

[19] Even if post-May 18, 2005 purchases of blood reagents "restarted" the running of the statute with respect to a previously formed conspiracy, the law is clear that Plaintiffs are still not entitled to recover damages for purchases made before May 18, 2005. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997).

time within the limitations period. *Forbes v. Eagleson*, 228 F.3d 471, 486-87 (3d

Cir. 2000). The individual issues of proof associated with each of these three

elements predominate over common issues.

### A. Each Element of Fraudulent Concealment Gives Rise to Individualized Issues.

The Named Plaintiffs were aware or should have been aware of facts

sufficient to require them to investigate their price-fixing claims long before May

18, 2005. For example, the 30(b)(6) corporate representative of Health Network

Laboratories ("HNL"), Lloyd Carbaugh, testified about raising suspicions of

coordinated pricing going back to 2003. JA-4001-03. Mr. Carbaugh also

interpreted an e-mail he received in 2003 as an admission by Ortho that it was

coordinating its price increases with Immucor. JA-4011-14, JA-4017; *see also* JA-

4141, JA-4144 (Dep. of Named Plaintiff Schuylkill Medical Centers' 30(b)(6)

Designee) (testifying that price increases in 2000-2001 were viewed as inconsistent

with competition).

The Named Plaintiffs' lack of due diligence is another source of substantial

individualized proof. For example, when Larkin Community Hospital's 30(b)(6)

representative, Maria Fennema, was asked why Larkin did not make any inquiry of

its supplier, Immucor, she testified that they "just – didn't." JA-4034. Even some

of the Named Plaintiffs who suspected coordinated pricing took no action in

response to their suspicions. *See* JA-4006-08 (Carbaugh Dep.) ("no action" except

becoming "frustrated").  This evidence from individual Named Plaintiffs is

relevant to the fraudulent concealment claims and would be admissible at trial.

*See, e.g.*, *In re Aspartame Antitrust Litig.*, 416 F. App'x 208, 212 (3d Cir. 2011)

(noting plaintiffs' 30(b)(6) testimony that no steps were taken to investigate the

alleged price fixing, despite storm warnings).  Finally, proof of concealment is

another significant source of individualized proof, as the explanations for the price

increases that were allegedly received by Named Plaintiffs varied widely.  *See,*

*e.g.*, JA-3437-39 (Pls.' Responses to Defs.' Interrogatory No. 11).

The number of individualized issues would grow exponentially if fraudulent

concealment claims were also advanced on behalf of the thousands of absent class

members.  Examples of such individualized issues of notice include:

- In September 2004, a purchaser and member of Novation observed to the GPO that:  "[W]hen the only competition introduces a price increase simultaneously, there seems to be a sense of collusion in the marketplace."  JA-3430 (Sept. 2004 E-mail).

- On January 31, 2005, a purchaser posted on an industry blog an entry encouraging other purchasers to take their complaints about price increases to antitrust authorities:  "Maybe it is time now not to go to the FDA and complain but to the Federal Trade Commission and ask them if this is a[n] unfair monopolistic trade on the part of the two major players."  JA-3425 (Pathlabtalk.com Entry).

- Another purchaser complained on February 2, 2005, "It appears the lack of competition has led to a little price gouging.  Maybe we should all send letters to our Senators and Representatives as well as to local news media for investigations to be initiated?"  JA-3426 (Pathlabtalk.com Entry).

In its Class Certification Opinion, the district court did not assess, pursuant to Rule 23(b)(3), how these individual issues of fraudulent concealment might impact the manageability of a trial involving class-wide claims for pre-May 18, 2005 damages.  The district court simply suggested that these individualized issues could be addressed in the same manner as individualized issues relating to damages – in a separate damages phase of the litigation.  JA-50.  The district court further truncated its 23(b)(3) analysis by dismissing the evidence of notice and due diligence as "highly similar to, and no more complex than, the individual evidence that failed to preclude certification in *Linerboard*."  *Id.*

This Court's decision in *In re Linerboard Antitrust Litigation*, 305 F.3d 145 (3d Cir. 2002), was not a license to ignore the individual issues of notice and due diligence.  *See, e.g.*, *In re Ford Motor Co. E-350 Van Prods. Liab. Litig.* (No. II), MDL No. 1687, 2012 U.S. Dist. LEXIS 13887, at *131 (D.N.J. Feb. 6, 2012) ("*Linerboard* cannot be read to prohibit *consideration of the individualized issues* arising from statute-of-limitations defenses for purposes of determining predominance under Rule 23(b)(3).").  The presence of individualized issues of notice and due diligence is thus a factor that the district court should have assessed in deciding whether the requirements of Rule 23(b)(3) were met.  *See, e.g.*, *Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 F. App'x 296, 301 (5th Cir. 2004); *Ford*, 2012 U.S. Dist. LEXIS 13887, at *131 ("[T]his Court finds that

Ford's statute-of-limitations defenses and Plaintiffs' equitable tolling rejoinders are relevant to this Court's consideration of predominance.").

The Supreme Court's decision in *Comcast* also undercuts the district court's reliance on *Linerboard* and its holding that the predominance of individual fraudulent concealment issues, like individual damages issues, does not preclude class certification. In *Comcast*, the Supreme Court clarified that individual damages issues may preclude certification under Rule 23(b)(3) and must be closely scrutinized at the class certification stage to ensure they do not "overwhelm" questions common to the class. 133 S. Ct. at 1433. Thus, it was improper for the district court to defer its Rule 23(b)(3) analysis of individual fraudulent concealment issues until later stages in the litigation. *Id.*

### B.     The District Court Also Erred by Not Requiring a Trial Plan for Resolving the Thousands of Fraudulent Concealment Claims.

The 2003 amendments to Rule 23, which post-date *Linerboard*, mandate a trial plan as part of the class certification process. Rule 23(c)(1)(B), which was added to the Federal Rules of Civil Procedure in 2003, requires that a class certification order "define . . . the claims, issues, or defenses" to be certified. *See* Fed. R. Civ. P. 23(c)(1)(B). This Court has interpreted this requirement to mean "that the text of the order or an incorporated opinion must include . . . a readily discernible, clear, and complete list of the claims, issues or defenses to be treated on a class basis." *Wachtel*, 453 F.3d at 187-88.

Under this standard, mere identification of certified claims is not enough. *Id.* at 185. Rather, the order must present a statement regarding "the full scope and parameters" of the claims, issues, and defenses to be tried on a class-wide basis. *See id.* at 185, 189 (vacating certification order because it was "unclear, intermittent, and incomplete" and evidenced no "intent to explicitly define which claims, issues or defenses are to be treated on a class basis for the remainder of the litigation"); *see also Nafar v. Hollywood Tanning Sys.*, 339 F. App'x 216, 219, 225 (3d Cir. 2009) (vacating class certification order because the order failed to comply with Rule 23(c)(1)(B)).

Here, the district court erred by not requiring Plaintiffs to meet even the minimum requirements of Rule 23(c)(1)(B). Plaintiffs merely presented a list of generalized claims, copied from their Complaint, without any clear statement of the claims, issues, and defenses in a manner that describes the "full scope and parameters" of the litigation. Plaintiffs did not even include Ortho's limitations defense or fraudulent concealment as among the issues to be certified for class treatment. As the Advisory Committee noted in describing the 2003 amendments to Rule 23, at the class stage "[a] critical need is to determine how the case will be tried." Fed. R. Civ. P. 23 advisory committee note on 2003 amendments. The district court's Class Certification Order does not address that critical need.

Plaintiffs' failure to present a plan for how to address each element of a fraudulent concealment claim is not just a procedural technicality.  In a decision that both post-dates *Linerboard* and the 2003 Amendments to Rule 23, the Supreme Court held that the Rules Enabling Act guarantees a defendant's right to assert any available affirmative defense against each and every class member and that a class cannot be certified if certification would preclude a defendant from litigating its statutory defenses.  *Wal-Mart*, 131 S. Ct. at 2561 ("Because the Rules Enabling Act forbids interpreting Rule 23 'to abridge, enlarge or modify any substantive right,' a class cannot be certified on the premise that [the defendant] will not be entitled to litigate its statutory defenses to individual claims." (citations omitted)).

The prospects of infringing Ortho's substantive rights by not accounting for the individual issues of fraudulent concealment are compounded by the district court's pre-certification denial of Ortho's request for absent class member discovery on fraudulent concealment issues.  JA-5-7 (July 22, 2012 Order).  With no trial plan and no absent class member discovery, Ortho is faced with the untenable situation of having its statute of limitation defense against *thousands* of antitrust claimants decided on the basis of evidence obtained from approximately *thirty* class representatives.  As such, the district court's Class Certification Order

suffers from the additional error of creating an improper "trial by formula" on Plaintiffs' fraudulent concealment claims. *Wal-Mart*, 131 S. Ct. at 2561.

## CONCLUSION

For each of the foregoing reasons, this Court should rule that Plaintiffs did not satisfy their burden under Rule 23 of the Federal Rules of Civil Procedure, and the district court's order granting Plaintiffs' Motion for Class Certification should be reversed.

Respectfully submitted,

Dated:  May 8, 2013

 s/ Paul H. Saint-Antoine
Paul H. Saint-Antoine (PA ID #56224)
Joanne C. Lewers (PA ID #81195)
Richard E. Coe (PA ID #94539)
Chanda A. Miller (PA ID #206491)
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA  19103-6996
Telephone:  (215) 988-2700

Jerome A. Swindell
Assistant General Counsel
JOHNSON & JOHNSON
1 Johnson & Johnson Plaza
New Brunswick, NJ  08933
Telephone:  (732) 524-0400

*Attorneys for Appellant Ortho-Clinical Diagnostics, Inc.*

## CERTIFICATES OF COMPLIANCE REQUIRED BY FEDERAL AND LOCAL RULES OF APPELLATE PROCEDURE

Bar Membership

Pursuant to Third Circuit L.A.R. 28.3(d), I hereby certify that I, Joanne C. Lewers, Richard E. Coe, Chanda A. Miller, and Jerome A. Swindell are each members of the Bar of the Court of Appeals for the Third Circuit.

Fed. R. App. P. 32(a) Compliance

The brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,888 words, as counted by Microsoft Word 2010, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Anti-Virus Certification

Appellant Ortho-Clinical Diagnostics, Inc.'s Opening Brief was scanned for viruses using Microsoft Forefront Endpoint Protection, and no viruses were detected.

Identical Documents

The electronic and hard copies of Appellant Ortho-Clinical Diagnostics, Inc.'s Opening Brief and the Joint Appendix filed today are identical.

Dated:  May 8, 2013                    s/ Paul H. Saint-Antoine
                                       Paul H. Saint-Antoine

### CERTIFICATE OF SERVICE

I, Paul H. Saint-Antoine, certify that a true and correct copy of Appellant Ortho-Clinical Diagnostics, Inc.'s Opening Brief and a true and correct copy of the Joint Appendix were filed electronically using the Court's CM/ECF System. This System sent a Notice of Docket Activity to Appellees' Counsel, who are Filing Users. In addition, I sent one copy of each of the foregoing documents via hand delivery to Appellees' Counsel at the address shown below:

> Jeffrey Corrigan, Esq.
> Spector Roseman Kodroff & Willis, P.C.
> 1818 Market Street, Suite 2500
> Philadelphia, PA 19103
>
> *Counsel for Appellees*

Dated: May 8, 2013          s/ Paul H. Saint-Antoine
                                       Paul H. Saint-Antoine