# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

Case No. 12-4067

---

IN RE:  BLOOD REAGENTS ANTITRUST LITIGATION

---

Appeal from the Order of the United States District Court for
the Eastern District of Pennsylvania Granting Class Certification
in Multi-District Litigation Docket No. 2:09-MD-02081-JD

---

## REPLY BRIEF OF APPELLANT
## ORTHO-CLINICAL DIAGNOSTICS, INC.

---

Jerome A. Swindell
Assistant General Counsel
JOHNSON & JOHNSON
1 Johnson & Johnson Plaza
New Brunswick, NJ  08933
Telephone:  (732) 524-0400

Paul H. Saint-Antoine
Joanne C. Lewers
Richard E. Coe
Chanda A. Miller
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA  19103
Telephone:  (215) 988-2700

*Attorneys for Appellant Ortho-
Clinical Diagnostics, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ................................................................................... 1

ARGUMENT ......................................................................................... 3

I.    PLAINTIFFS' ARGUMENT THAT THE DISTRICT COURT'S
    DECISION COMPLIED WITH CURRENT STANDARDS OF
    CLASS CERTIFICATION IS FLAWED IN SEVERAL RESPECTS ......... 3

    A.    The District Court's Decision Conflicts with Controlling Case
        Law on Class Certification .................................................... 3

    B.    The District Court's Analysis of Dr. Beyer's Benchmark
        Methodology Was Substantially Incomplete ....................................... 7

        1.    The District Court Did Not Find that Dr. Beyer's
            Selection of OCV as a Benchmark Was Reliable or
            Scientific ..................................................................... 7

        2.    The District Court Also Failed to Make a Finding on
            Whether Accounting for Costs and Demand Would Have
            Changed Dr. Beyer's Conclusions About Impact ..................... 9

        3.    The District Court Also Failed to Make a Finding that
            Dr. Beyer's "RhoGAM" and "Immucor Cost"
            Benchmarks Were Reliable ............................................... 13

    C.    Plaintiffs Are Also Wrong to Defend the Class Certification
        Decision on the Basis that This Is a "Straightforward" Price-
        Fixing Case .............................................................................. 15

II.    PLAINTIFFS CONTINUE TO ADVOCATE FOR AN INCORRECT
    STANDARD OF ANTITRUST IMPACT, WHICH THE DISTRICT
    COURT ADOPTED IN ERROR ........................................................ 21

III.    NEITHER THE DISTRICT COURT NOR PLAINTIFFS HAVE
     EVEN ATTEMPTED TO EXPLAIN HOW, AS A PRACTICAL
     MATTER, THE FRAUDULENT CONCEALMENT CLAIMS WILL
     BE TRIED .................................................................................. 24

CONCLUSION ..................................................................................... 28

# TABLE OF AUTHORITIES

## CASES

*Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp., L.P.*,
 247 F.R.D. 156 (C.D. Cal. 2007)................................................................. 22-23

*Am. Seed Co. v. Monsanto Co.*,
 271 F. App'x 138 (3d Cir. 2008) .......................................................................17

*Attorney Gen. of Okla. v. Tyson Foods, Inc.*,
 565 F.3d 769 (10th Cir. 2009) .............................................................................6

*Bogosian v. Gulf Oil Corp.*,
 561 F.2d 434, 455 (3d Cir. 1977) ............................................................... 16-17

*In re Cardizem CD Antitrust Litigation*,
 200 F.R.D. 297 (E.D. Mich. 2001) ...................................................................24

*In re Chocolate Confectionary Antitrust Litig.*,
 MDL No. 1935, 2012 U.S. Dist. LEXIS 174681 (M.D. Pa. Dec. 7, 2012)..........6

*Comcast Corp. v. Behrend*,
 569 U.S. __, 133 S. Ct. 1426 (2013).........................................................*passim*

*Comcast Corp. v. Behrend*,
 655 F.3d 182 (3d Cir. 2011),
 *rev'd* 569 U.S. __, 133 S. Ct. 1426 (2013) ...................................................3, 4, 9

*Daubert v. Merrell Dow Pharm., Inc.*,
 509 U.S. 579 (1993).............................................................................................5

*Eisen v. Carlisle & Jacquelin*,
 417 U.S. 156 (1974).............................................................................................4

*Exhaust Unlimited, Inc. v. Cintas Corp.*,
 223 F.R.D. 506 (S.D. Ill. 2004) ........................................................................22

*Forbes v. Eagleson*,
 228 F.3d 471 (3d Cir. 2000) ..............................................................................26

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
 392 U.S. 481 (1968)...........................................................................................23

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008) .......................................................................*passim*

*In re Linerboard Antitrust Litig.*,
  305 F.3d 145 (3d Cir. 2002) ...............................................................................25

*Isaksen v. Vermont Castings, Inc.*,
  825 F.2d 1158 (7th Cir. 1987) ............................................................................16

*Kenett Corp. v. Mass. Furniture & Piano Movers Ass'n*,
  101 F.R.D. 313 (D. Mass. 1984)..........................................................................22

*Kilcrease v. T.W.E., Ltd.*,
  No. 03-1013, 2004 U.S. Dist. LEXIS 30778 (D. Kan. May 18, 2004) ...............8

*Madison v. Chalmette Refining, LLC*,
  637 F.3d 551 (5th Cir. 2011) ...............................................................................27

*MP Vista, Inc. v. Motiva Enterprises, LLC*,
  286 F.R.D. 299 (E.D. La. 2012) ..........................................................................27

*In re Paxil Litig.*,
  212 F.R.D. 539 (C.D. Cal. 2003)..........................................................................27

*Sullivan v. DB Investments, Inc.*,
  667 F.3d 273 (3d Cir. 2011),
  *cert. denied sub nom.*, 132 S. Ct. 1876 (2012) ............................... 1-2, 19, 20, 25

*Wachtel v. Guardian Life Ins. Co.*,
  453 F.3d 179 (3d Cir. 2006) ..........................................................................3, 27

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. __, 131 S. Ct. 2541 (2011)......................................................................5

*White v. R.M. Packer Co.*,
  635 F.3d 571 (1st Cir. 2011)................................................................................18

*Williamson Oil Co. v. Philip Morris USA*,
  346 F.3d 1287 (11th Cir. 2003) ...........................................................................17

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012) .................................................................................8

## STATUTES, RULES & REGULATIONS

Fed. R. Civ. P. 23 ..............................................................................*passim*

# INTRODUCTION

Plaintiffs' defense of the district court's class certification decision rests principally on two unsupportable propositions. First, they state explicitly that this is a "straightforward" price-fixing case, *see, e.g.*, Appellees' Br. at 3, and implicitly that it is therefore presumptively fit for certification under Rule 23. Any such presumption that this case should be certified simply because of the nature of Plaintiffs' allegations runs afoul of this Court's mandate that class certification shall be based on actual, not presumed, conformance with the requirements of Rule 23. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 326 (3d Cir. 2008). Plaintiffs' characterization of this litigation, moreover, ignores its unique factual circumstances, which even the district court recognized presented Plaintiffs with a "particularly difficult [task] in this case" of estimating but-for prices, and which deprived them of an ability to rely on multiple regression and "before-and-after" economic methods commonly used in other price-fixing litigation. JA-40.

Second, Plaintiffs have attempted to justify the district court's decision to defer further analysis of their expert's benchmark methodology, based on the proposition that it is sufficient if Dr. Beyer's methods purport to be common to the class. *See, e.g.*, Appellees' Br. at 25 ("Whether the higher prices resulted from conspiracy or duopoly is not a class certification question."). Their reliance on this Court's en banc decision in *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 300

(3d Cir. 2011), *cert. denied sub nom.*, 132 S. Ct. 1876 (2012), involving approval of a multi-state settlement class, is misplaced. *See, e.g.*, Appellees' Br. at 25-26.

Plaintiffs must do more than propose economic methods or make a "threshold showing" that the predominance requirements of Rule 23(b)(3) have been met. *Hydrogen Peroxide*, 552 F.3d at 318, 321-22. It is also not enough that their economic methods purport to be common to the class; all evidence, including expert testimony, is subject to rigorous analysis at the class certification stage. *Comcast Corp. v. Behrend*, 569 U.S. __, 133 S. Ct. 1426, 1433 (2013) (rejecting logic that "*any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be"); *Hydrogen Peroxide*, 552 F.3d at 323 ("opinion testimony should not be uncritically accepted").

In sum, Plaintiffs cannot reconcile the district court's decision with controlling standards for class certification. The district court, after identifying the evidentiary challenges confronting Plaintiffs in their estimation of but-for prices, JA-40, and acknowledging "some force" to the criticisms of their expert's proposed methods for meeting those challenges, then committed reversible error by holding that it "must defer" further analysis of the merits and reliability of those methods until the summary judgment stage, *see* JA-39.

Plaintiffs' failure to account for more recent class certification decisions extends to the other errors in the district court's decision. The district court should not have, as Plaintiffs argue, "disregarded" Ortho's argument that there be a trial plan for resolving the thousands of fraudulent concealment claims. *See* Appellees' Br. at 55. In addition, Plaintiffs' fraudulent concealment arguments are incompatible with this Court's opinion in *Wachtel v. Guardian Life Ins. Co.*, 453 F.3d 179 (3d Cir. 2006), and other decisions post-dating the 2003 amendments to Rule 23.

## ARGUMENT

### I.  PLAINTIFFS' ARGUMENT THAT THE DISTRICT COURT'S DECISION COMPLIED WITH CURRENT STANDARDS OF CLASS CERTIFICATION IS FLAWED IN SEVERAL RESPECTS.

#### A.  The District Court's Decision Conflicts with Controlling Case Law on Class Certification.

Despite having found "some force" to Ortho's criticisms of Dr. Beyer's model and "some deficiencies" with his methodology, the district court mistakenly held that it "must defer" further analysis until the summary judgment stage. JA-39, JA-44. Citing this Court's decision in *Comcast Corp. v. Behrend*, 655 F.3d 182 (3d Cir. 2011), *rev'd* 569 U.S. __, 133 S. Ct. 1426 (2013), the district court reasoned that it "ha[d] not 'reached the stage of determining on the merits whether the methodology is a just and reasonable inference or speculative,'" and that any

analysis of the reliability of Dr. Beyer's damages model was not necessary to the Rule 23 analysis. JA-38-39 (quoting *Comcast*, 655 F.3d at 206).

In attempting to minimize the district court's error, Plaintiffs argue that the district court quoted the "problematic" language from this Court's *Comcast* opinion – that the court need not decide at class certification "whether the methodology is a just and reasonable inference or speculative" – only three times. Appellees' Br. at 31 & n.3. What is most important is not how many times the district court quoted that *Comcast* language, but how significantly the court relied on it to defer a rigorous analysis of Dr. Beyer's benchmark methodology. Relying on the "problematic" language as the foundation for much of its decision, the district court reasoned that an analysis of the issues raised by Ortho could be deferred because "[v]irtually all of Ortho's arguments" questioned whether Dr. Beyer's methodology is a just and reasonable inference or speculative, rather than whether the methodology could be proven using classwide proof. *See* JA-38-39 (citing *Comcast*, 655 F.3d at 206).

The district court's interpretation of this Court's opinion in *Comcast*, as well as its reliance on *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974), to defer an analysis of Dr. Beyer's methodology, is in conflict with controlling class certification law. The Supreme Court, in its *Comcast* decision, explained that the type of approach taken by the district court here – deferring a decision on the issue

of whether a damages model is "a just and reasonable inference or speculative" – "flatly contradicts" the Court's precedent. *See* 133 S. Ct. at 1433. Additionally, as this Court has previously explained, "*Eisen* is best understood to preclude only a merits inquiry *that is not necessary to determine a Rule 23 requirement*," and "[a] concern for merits-avoidance should not be talismanically invoked to artificially limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met her burden of establishing each of the Rule 23 class action requirements." *Hydrogen Peroxide*, 552 F.3d at 317, 318 n.17 (emphasis added) (quotation marks and citation omitted); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. __, 131 S. Ct. 2541, 2552 n.6 (2011) (observing that *Eisen* is "sometimes mistakenly cited"). The current standards for class certification are supported by the 2003 amendments to Rule 23. In *Hydrogen Peroxide*, this Court examined those amendments and explained that they "guide the trial court in its proper task—to consider carefully all relevant evidence and make a definitive determination that the requirements of Rule 23 have been met before certifying a class." 552 F.3d at 320.

In tacit recognition that the district court's analysis fell short of the current standards for class certification, Plaintiffs make a brief "waiver" argument based on the absence of a separate motion by Ortho to strike Dr. Beyer's class report, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

In making that argument, Plaintiffs miscomprehend the source of the court's
obligation to assess the merits and reliability of the proposed expert methodology
at the class certification stage.[1]  *See* Appellees' Br. at 21.  That assessment stems
from the district court's obligation to conduct a "rigorous analysis" to determine if
Plaintiffs have met *their* burden to demonstrate that the requirements of Rule 23
have been satisfied.  *See In re Chocolate Confectionary Antitrust Litig.*, MDL
No. 1935, 2012 U.S. Dist. LEXIS 174681, at *51 (M.D. Pa. Dec. 7, 2012) ("[T]he
court finds that a thorough *Daubert* analysis is appropriate at the class certification
stage of this MDL in light of the court's responsibility to apply a 'rigorous
analysis' to determine if the putative class has satisfied the requirements of Rule
23.").[2]

---

[1] A separate motion to strike Dr. Beyer's report from the record is not necessary at
the class certification stage because, as with a bench trial, the gatekeeper and
factfinder are the same.  *See, e.g.*, *Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565
F.3d 769, 779 (10th Cir. 2009) ("the usual concerns regarding unreliable expert
testimony reaching a jury obviously do not arise when a district court is conducting
a bench trial").  Nor would such a motion to strike from the record be appropriate
in this context, as the district court is obligated to rigorously analyze the expert
report to determine if the requirements of Rule 23 have been met.  *See, e.g.*,
*Hydrogen Peroxide*, 552 F.3d at 323 ("opinion testimony should not be uncritically
accepted as establishing a Rule 23 requirement merely because the court holds the
testimony should not be excluded, under *Daubert* or for any other reason").

[2] Plaintiffs also cite footnote 4 from the Supreme Court's decision in *Comcast*,
where there was some question as to whether the defendant had taken issue with
the plaintiffs' expert's damages model on reliability grounds.  Appellees' Br. at 32
(quoting *Comcast*, 133 S. Ct. at 1431 n.4).  Here, in contrast, there is no question

(continued…)

**B.    The District Court's Analysis of Dr. Beyer's Benchmark Methodology Was Substantially Incomplete.**

In an effort to mask the deficiencies in the class certification decision, Plaintiffs list "numerous findings" by the district court.  *See* Appellees' Br. at 4-7. Plaintiffs' list is more notable, however, for the absence of key findings by the district court on the issues relating to the merits and reliability of Dr. Beyer's benchmark methodology.[3]

**1.    The District Court Did Not Find that Dr. Beyer's Selection of OCV as a Benchmark Was Reliable or Scientific.**

It is not sufficient at the class certification stage for the district court merely to find that benchmark models are "widely accepted" in antitrust cases.  *See*

---

(…continued)

that Ortho contested the reliability of Dr. Beyer's benchmark methodology throughout the class certification proceedings – in briefing, at oral argument, and when Dr. Beyer provided videotaped testimony.  *See, e.g.*, JA-304-05, JA-308, JA-312-13, JA-315-16, JA-323-26, JA-335-37, JA-339-41 (Class Cert. Hr'g Tr.); JA-669-71 (Beyer Class Cert. Hr'g Testimony); *see also, e.g.*, Ortho's Opp'n to Pls.' Mot. for Class Certification, Mar. 2, 2012, Dkt. No. 165, at 50-51, 56-75. Plaintiffs were aware of Ortho's reliability objections and professed to be prepared to address them under a *Daubert* standard.  JA-375-76 (Class Cert Hr'g Tr.).

[3] Many of the "findings" listed by Plaintiffs are either vague generalizations or are inconsequential.  For example, several of them merely reflect the observation that prices for blood reagents rose during the class period.  Plaintiffs' own expert, Dr. Beyer, assumed that prices would rise even in the absence of the alleged conspiracy.  Similarly, the "findings" that most customers viewed blood reagents as commodity products or that demand was inelastic do nothing to assess whether Dr. Beyer's model was capable of distinguishing between price increases due to the change in market structure and increases resulting from the alleged conspiracy.

Appellees' Br. at 6 ("Finding" No. 19).  Using economic buzz words such as

"yardstick" and "benchmark" does not insulate an economic model from rigorous

analysis.  *See, e.g.*, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir.

2012) (affirming district court's exclusion of expert testimony even though it used

"methodologies regularly employed by economists" because "the underlying data

was not sufficiently reliable"); *Kilcrease v. T.W.E., Ltd.*, No. 03-1013, 2004 U.S.

Dist. LEXIS 30778, at *6 (D. Kan. May 18, 2004) ("Buzz words . . . do not render

[an expert's] opinions admissible."); Ortho's Br. at 34-36, 44 (listing decisions that

rejected benchmark methodologies, including those proposed by Dr. Beyer).

   The district court was required to find by a preponderance of the evidence

that the benchmark selected by Dr. Beyer for demonstrating impact was capable of

reliably and scientifically predicting that but-for prices of blood reagents in the

absence of the alleged conspiracy would have been lower than actual prices.  As

part of that determination, the district court was also required to find that Dr.

Beyer's model properly accounted for the influence of non-conspiratorial factors,

such as the change in market structure to a duopoly, on price.  The district court

did not, however, make such findings with respect to either Dr. Beyer's reliance on

business plans known as Operation Create Value ("OCV"), or his disregard of the

Blood Bank Leadership Plan "(BBLP").  Instead, it erroneously concluded that it

had "not reached the stage of determining on the merits whether the methodology

is a just and reasonable inference or speculative." *See* JA-46 (citing *Comcast*, 655 F.3d at 206). Without finding that the data and benchmarks selected by Dr. Beyer were reliable and scientific, the district court was not in a position to assess whether his economic model was capable of proving impact and damages.[4] The district court erroneously concluded that it was sufficient that Dr. Beyer's model "utilize[d] common proof." JA-45 (citing *Comcast*, 655 F.3d at 206-07). This was reversible error. *See, e.g.*, *Comcast*, 133 S. Ct. at 1433 (rejecting the logic that "*any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be").

> ### 2. The District Court Also Failed to Make a Finding on Whether Accounting for Costs and Demand Would Have Changed Dr. Beyer's Conclusions About Impact.

The district court also erred by deferring further analysis of the criticism that Dr. Beyer's model did not account for demand and cost factors during the first half of the class period. Changes in demand and costs, like changes in market structure, are fundamental to any estimate of but-for prices – and, therefore, essential to an analysis of any method proposed for proving antitrust impact and damages.

---

[4] As Ortho addressed in its Opening Brief, Dr. Beyer's benchmark methodology is the only form of common proof proffered by Plaintiffs that even purports to compare but-for and actual prices, which their expert acknowledges is essential to a showing of antitrust impact. JA-728, JA-852-53 (Beyer Class Cert. Testimony); Ortho's Br. at 46-48.

In their Opposition Brief, Plaintiffs attempt to excuse the district court's deferral of this significant reliability issue at the class certification stage in three mutually inconsistent ways. First, they aver that "the Court held that including costs and demand might make the model '*more* accurate,' but the inclusion of the word 'more' creates a reasonable inference that the Court already found the model sufficiently accurate." Appellees' Br. at 42 (quoting JA-45). As a preliminary matter, the district court neither held nor found that including costs and demand would make Dr. Beyer's model "more accurate"; rather, the court noted that Ortho's expert had "argued persuasively" that Dr. Beyer's model would be "more accurate" if he had accounted for costs. *See* JA-45. Moreover, any question about whether the district court had made requisite findings on key reliability issues should not hinge on "reasonable inferences" drawn from a single word in its Class Certification Opinion; the findings should be express. *See Hydrogen Peroxide*, 552 F.3d at 307 ("Factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence."). Regardless, no such "reasonable inferences" are even possible here; the district court expressly stated that it was deferring any further analysis of the missing demand and cost factors until "the merits stage of the litigation." JA-46.

Second, and inconsistently, Plaintiffs observe that the "District Court left it up to Dr. Beyer to decide if it was 'necessary' to further account for cost and

demand in his damages model 'before the merits stage.'"  Appellees' Br. at 43

(quoting JA-45-46).  At the class certification stage, the district court cannot

abdicate its responsibility to engage in rigorous analysis of Plaintiffs' economic

proof, least of all to Plaintiffs' own economic expert.  Assurances from a plaintiff

(or its expert) that it intends or plans to meet the Rule 23 requirements at a later

stage are not sufficient.  *Hydrogen Peroxide*, 552 F.3d at 318.  Regardless of what

Plaintiffs' economic expert says, the district court at the class stage was obligated

to engage in rigorous analysis of all the economic proof and weigh conflicting

expert testimony.

Plaintiffs try to discount the importance of costs by claiming cost increases

were "dwarfed" by price increases, suggesting that accounting for costs would not

change Dr. Beyer's conclusions about impact.[5]  Appellees' Br. at 14.  Plaintiffs

ignore the fact that even relatively small adjustments in Dr. Beyer's benchmark

methodology can lead to significant changes in his conclusions about impact.  For

example, in response to criticisms from Ortho's expert that 29% of Ortho's sales

and 16% of Immucor's sales were below Dr. Beyer's predicted but-for price,

Plaintiffs' expert shifted by a year the start date of his 25% but-for increases.  Not

---

[5] This statement is factually inaccurate.  Ortho cited increases in costs of raw materials of 127% and 97% for different product lines as a reason for its 2005 price increase, Ortho's Br. at 16, which are nearly identical to the 125% Plaintiffs claim Ortho raised prices, Appellees' Br. at 17.

only was this change by Dr. Beyer arbitrary and inconsistent with the OCV plan, *see* Ortho's Br. at 39-40, but it demonstrates how any adjustments in his methodology can have significant effect on any showing of antitrust impact. According to Dr. Beyer, costs increased by more than 25% for one or both companies in three of the four years between 2001 and 2004. Ortho's Br. at 42. Importantly, because the district court did not require Dr. Beyer to account for costs or demand, there is no way of knowing what effect accounting for these factors would have had on his conclusions about impact.

Third, Plaintiffs argue that "even if the District Court had deferred its decision regarding Ortho's argument that Dr. Beyer's model did not adequately account for cost and demand, the Court appropriately did so because it is a merits argument that does not overlap with a Rule 23 requirement." Appellees' Br. at 45 (citations omitted). This final argument, which is squarely at odds with the Supreme Court's decision in *Comcast*, would reduce Rule 23(b)(3)'s predominance requirement to a nullity. 133 S. Ct. at 1433. Without assessing the significance of demand and costs, the district court omitted another finding essential to a determination of whether Dr. Beyer's model is capable of proving antitrust impact and damages. "By refusing to entertain arguments against [Plaintiffs'] damages model that bore on the propriety of class certification, simply because those arguments would also be pertinent to the merits determination," the

district court "ran afoul of [Supreme Court] precedents requiring precisely that

inquiry." *See id.* at 1432-33; *Hydrogen Peroxide*, 552 F.3d at 318.

### 3.  The District Court Also Failed to Make a Finding that Dr. Beyer's "RhoGAM" and "Immucor Cost" Benchmarks Were Reliable.

The district court's analysis also fell short of the requisite rigorous analysis

with respect to Dr. Beyer's so-called "RhoGAM" yardstick, which he proposed to

use in estimating "but-for" prices during the second half of the class period.

Plaintiffs insist that the district court completed its analysis of the RhoGAM

yardstick, Appellees' Br. at 42, but that contention is belied by the district court's

Opinion.  The court expressly stated that it was "not entirely persuaded by

Dr. Beyer's explanation for why he uses RhoGAM as a yardstick only when the

RhoGAM market had three competitors.  However, that issue does not require the

Court to reject the RhoGAM yardstick *at the certification stage*."  JA-48 n.15

(emphasis added).  The district court's failure to resolve the dispute between

Dr. Beyer and Dr. Bronsteen about whether the RhoGAM yardstick was scientific

and reliable at the class certification stage is contrary to this Court's guidance in

*Hydrogen Peroxide*, 552 F.3d at 323 ("Weighing conflicting expert testimony . . .

may be integral to the rigorous analysis Rule 23 demands.").

Similarly, the district court failed to make the requisite findings with respect

to whether Immucor's costs could be used as an alternative method to predict

Ortho's but-for prices during the second half of the class period.  Dr. Bronsteen opined that Immucor's costs were not a reasonable proxy for Ortho's costs because (1) Immucor's costs were 30% to 60% less than Ortho's; (2) Ortho's prices were more than twice Immucor's prices by the end of the class period, which suggests they had different costs; and (3) Immucor, unlike Ortho, had significant cost changes during the class period associated with closing a second production facility.  JA-4174-75 (Bronsteen Report); JA-429-30 (Class Cert. Hr'g Tr.); Ortho's Br. at 19-20.  Instead of addressing Dr. Bronsteen's criticisms, the district court adopted Dr. Beyer's unsubstantiated statement that the two companies used similar raw materials and then deferred further analysis.  JA-42 n.12.

In sum, notwithstanding Plaintiffs' contention to the contrary, the district court relied on this Court's *Comcast* decision to defer making findings on issues that "bore on the propriety of class certification."  Appellees' Br. at 31-32 (citing *Comcast*, 133 S. Ct. at 1432-33).  With respect to several different aspects of Dr. Beyer's model, the district court declined to decide "whether the methodology is a just and reasonable inference or speculative," which is what the Supreme Court in *Comcast* held that courts must do at the class certification stage.  133 S. Ct. at 1432-33.

### C.    Plaintiffs Are Also Wrong to Defend the Class Certification Decision on the Basis that This Is a "Straightforward" Price-Fixing Case.

Plaintiffs repeatedly insist that this is a straightforward price-fixing case. *See, e.g.*, Appellees' Br. at 1 ("straightforward price-fixing claims"); *id.* at 3 ("archetypal example"; "straightforward"); *id.* at 18 ("straightforward"; "paradigm for class certification").  Plaintiffs' syllogistic argument is that, because their Complaint alleges a horizontal price-fixing case and because, as they contend, "class certification is routinely granted in horizontal price-fixing cases," *id.* at 21, this case should be certified as a class action, too.  A presumption that the requirements of Rule 23 have been met merely due to the nature of Plaintiffs' allegations is anathema to the rigorous analysis required at the class certification stage.  As this Court observed in *Hydrogen Peroxide*, "it does not follow that a court should relax its certification analysis, or presume a requirement for certification is met, merely because a plaintiff's claims fall within one of those substantive categories [of law]."  552 F.3d at 322 (citations omitted).

Even the district court recognized that Plaintiffs' claims presented unique factual circumstances, which made estimating but-for prices anything but straightforward.  *See* JA-40.  The district court acknowledged that the market for blood reagents became a duopoly "only a short time before" Defendants allegedly conspired to fix prices, making it "particularly difficult in this case" to estimate

but-for prices. *Id.* This change in market structure, moreover, made it "very difficult to make reliable use of empirical data regarding pre-conspiracy prices to estimate but-for prices." *Id.* That is because, as the district court further observed, "[m]arket consolidation tends to increase prices even in the absence of coordinated conduct." *Id.* (citing U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 6 (2010)). Thus, Plaintiffs faced the burden of distinguishing between the price effect of the alleged conspiracy and the price effect of the increased market concentration, without the benefit of traditional "before-and-after" benchmarks or multiple regression techniques for isolating such anticompetitive effects.[6] *See, e.g.*, *Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158, 1165 (7th Cir. 1987) (overturning damages award because "there was no evidence of how much the antitrust violation, as distinct from unrelated market forces, contributed to [plaintiff's] losses"). Plaintiffs attempted to circumvent this unique evidentiary burden at the class certification stage in one of two ways, both of which they now reassert to this Court.

First, Plaintiffs make a passing reference to the *Bogosian* short-cut as a basis to presume antitrust impact. Appellees' Br. at 2, 23 n.18 (citing *Bogosian v. Gulf*

---

[6] Indeed, Plaintiffs' economic expert, despite having worked on forty to forty-five price-fixing actions himself, could not identify any other case in which the alleged conspiracy coincided with a substantial reduction in the number of competitors and the formation of a duopoly. *See* JA-3471-72, JA-3562-64 (Beyer Dep.).

*Oil Corp.*, 561 F.2d 434, 455 (3d Cir. 1977)).  However, even the district court

recognized that the *Bogosian* shortcut was not sufficient "alone" to meet Plaintiffs'

burden at the class certification stage.  JA-28.  It held that "plaintiffs must present

additional evidence that they can prove impact using common proof."  *Id.* (citing

*Hydrogen Peroxide*, 552 F.3d at 326).  Any holding to the contrary would conflict

with this Court's mandate that class certification must be based on actual, not

presumed, conformance with the requirements of Rule 23.  *Hydrogen Peroxide*,

552 F.3d at 326; *Am. Seed Co. v. Monsanto Co.*, 271 F. App'x 138, 141 (3d Cir.

2008).

Whatever application the *Bogosian* shortcut might continue to have in other

price-fixing cases, any presumption of impact in this case would be inappropriate,

given the change in market structure prior to the inception of the alleged

conspiracy.  In oligopolies, which the market for blood reagents had become by

1999, price increases due to non-conspiratorial price leadership are a well-

recognized economic consequence.  *See, e.g.*, *Williamson Oil Co. v. Philip Morris

USA*, 346 F.3d 1287, 1299 (11th Cir. 2003) ("simple price leadership in [an

oligopolistic] market can readily increase all competitors' revenues").  All of the

market characteristics identified by Plaintiffs – inelastic demand for blood

reagents, fungible commodities, high barriers to entry – even if accepted as true, do

nothing to address the "particularly difficult" task of distinguishing between price

increases from non-collusive price leadership in a concentrated market and any increase attributable to the alleged price fixing. *See, e.g.*, *White v. R.M. Packer Co.*, 635 F.3d 571, 578-80 (1st Cir. 2011). Indeed, these market characteristics, if true, would make the industry susceptible to non-collusive duopoly conduct such as price leadership. JA-413-14 (Class Cert. Hr'g Tr.). In *White*, the First Circuit affirmed the grant of summary judgment in favor of defendants who were alleged to have fixed retail prices for gasoline. After observing that the market at issue had many of the same characteristics as those relied upon by Plaintiffs here, the court in *White* concluded that "[t]he evidence does nothing to explain whether the parallel pricing was achieved by agreement or mere interdependent decisions." 635 F.3d at 580.[7]

Second, Plaintiffs argue against having to distinguish between the source of the price increases for blood reagents – price fixing or duopoly – on the basis that it is simply a "common factual question" for the jury. Appellees' Br. at 24 n.19.

---

[7] For the same reasons, the so-called "Choo-Choo Train" pricing model, which Plaintiffs cite as a business strategy of discounting off of list prices, does nothing to address the difficult task of distinguishing list prices that are the result of price leadership from the price effects, if any, attributable to the alleged conspiracy. Furthermore, the empirical evidence reflects a reality that is far more complicated than the simple "Choo-Choo-Train" model. Defendants' pricing data rebut any presumption of uniform discounts off of list prices. For example, from 2005 onward, Immucor's actual prices to its customers deviated from a uniform discount model at all levels. JA-442-43 (Class Cert. Hr'g Tr.); JA-638 (Bronsteen Class Cert. Presentation).

They insist that: "Whether the higher prices resulted from conspiracy or duopoly is not a class certification question." *Id.* at 25 (citing *Sullivan*, 667 F.3d at 300). The problem with this argument is that estimating but-for prices is not an "either/or" proposition. Even absent an alleged conspiracy, prices would have risen during the class period. Plaintiffs' own expert concedes this point: Plaintiffs must find "a way of distinguishing . . . price changes that can be the result of the market power of a duopoly on the one hand and price increases that are caused by conspiratorial activity on the other." JA-3607 (Beyer Dep.). Thus, Plaintiffs must proffer a reliable economic model that is capable of isolating the price effect of the alleged conspiracy. Absent such common proof, the trial would be a matter of pure speculation as to which class members, if any, were impacted by the alleged conspiracy. *See, e.g.*, *Comcast*, 133 S. Ct. at 1433 (flatly rejecting the argument that "*any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be").[8]

---

[8] Plaintiffs' attempt to contrast *Comcast* on the basis that four theories of antitrust liability were offered there, and Plaintiffs offer only one theory here, is a distinction without a difference. The sources of the alternative price effects, whether different liability theories or changes in market structures, do not obviate the need for a plaintiff to identify a reliable model that can isolate the anticompetitive effects of the conduct at issue. *See Comcast*, 133 S. Ct. at 1435 (criticizing the "model's inability to bridge the differences between supra-competitive prices in general and supra-competitive prices attributable to [the legal theory in the case]").

Plaintiffs cite this Court's opinion in *Sullivan*, 667 F.3d 273, as support for their defense of the district court's decision to defer further analysis of their economic proof. *See, e.g.*, Appellees' Br. at 24 & n.19. Their reliance on *Sullivan* is misplaced. This Court's en banc decision in *Sullivan* addressed objections to a settlement class based on differences in state antitrust and consumer protection statutes. In affirming the district court's certification decision, this Court recognized a "key" distinction between certification for settlement purposes and for litigation purposes. 667 F.3d at 304 n.39. In particular, without the same level of scrutiny needed to assess whether a litigation class met the predominance and manageability requirements of Rule 23(b)(3), this Court in *Sullivan* refrained from further consideration and scrutiny of "'the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove' the disputed elements at trial." *Id.* at 306 (quoting *Hydrogen Peroxide*, 552 F.3d at 312).

Here, in the context of a proposed litigation class, that is precisely what should have happened. "Rule 23(b)(3) requires the court to consider how a trial on the merits would be conducted if a class were certified." *Hydrogen Peroxide*, 552 F.3d at 311 n.8. The district court should have inquired into the merits and the reliability of Dr. Beyer's proposed method or methods for distinguishing between duopoly and conspiratorial price effects. It should have addressed the several criticisms, described herein and in Ortho's Opening Brief, that Dr. Beyer's

proposed benchmark methodology does not reliably account for the change in 1999

to a duopoly market structure, or adequately factor in changes in demand and costs,

with the result that Plaintiffs have proffered no more than speculation on the

essential elements of antitrust impact and damages. *See generally* Ortho's Br. at

33-45. At the class certification stage, it was necessary for the district court to

assess whether Plaintiffs' benchmark methodology allows for "a just and

reasonable inference" – or, instead, is "speculative." *Comcast*, 133 S. Ct. at 1431.

By deferring such a rigorous analysis on the basis that it had not reached the

"stage" of addressing such issues on the merits of Dr. Beyer's model, the district

court committed reversible error. *See* JA-46.

## II. PLAINTIFFS CONTINUE TO ADVOCATE FOR AN INCORRECT STANDARD OF ANTITRUST IMPACT, WHICH THE DISTRICT COURT ADOPTED IN ERROR.

As Plaintiffs recognize, antitrust impact (or injury-in-fact) is a distinct

element of their claim. Appellees' Br. at 45. Thus, in addition to proving the

existence of an antitrust conspiracy, each Plaintiff and each putative class member

must be capable of proving that they were individually impacted by the alleged

conspiracy. Plaintiffs also agree that, in price-fixing cases, antitrust impact means

that the purchasers paid more than they would have paid absent the alleged

conspiracy. JA-728, JA-852-53 (Beyer Class Cert. Testimony). But, in proffering

Dr. Beyer's benchmark methodology, Plaintiffs advocated a standard of antitrust

impact that does not meet their burden of demonstrating individual injury-in-fact. Specifically, Plaintiffs contended at the class certification stage, and the district court agreed, that it is enough to show "that every purchaser that paid more for at least *one reagent* on at least one transaction during the Damage Period than it would have paid in the absence of the alleged anticompetitive conduct is considered to have been impacted." JA-4271 (Beyer Report (emphasis added)); JA-857-58 (Beyer Class Cert. Testimony).

Both of the price-fixing cases cited by Ortho in its Opening Brief, *Exhaust Unlimited, Inc. v. Cintas Corp.*, 223 F.R.D. 506, 513-14 (S.D. Ill. 2004), and *Kenett Corp. v. Mass. Furniture & Piano Movers Ass'n*, 101 F.R.D. 313, 316 (D. Mass. 1984), acknowledge that to establish injury-in-fact, Plaintiffs must consider each price determinant in the transaction, not just the allegedly offensive component. *See* Ortho's Br. at 51. It is immaterial that these cases addressed prices for services as opposed to "commodity products," *see* Appellees' Br. at 48-49, because the transactions at issue here each included a diverse mix of non-interchangeable products. *See, e.g.*, JA-4313-14 (Beyer Reply Report); JA-3736-37, JA-3825-26, JA-3880-83, JA-3925-26, JA-3928-29 (Harris Dep.).[9]

---

[9] Plaintiffs' suggestion that Ortho must come forward with evidence at the class certification stage to demonstrate what the result would be if they were to apply the correct standard, Appellees' Br. at 48-49, improperly relieves Plaintiffs of their well-established burden of proof. *Hydrogen Peroxide*, 552 F.3d at 311-12; *Allied*

(continued…)

In their Opposition Brief, Plaintiffs confuse the standard of antitrust impact, which entails an examination of the net effect on the transaction price, with the balancing of procompetitive and anticompetitive effects under the rule of reason. Ortho did not argue at the class certification stage that there is no antitrust impact because, for example, any net increase in the transaction price might have been offset by improved product quality. Nor did Ortho argue other possible procompetitive benefits must be balanced against any anticompetitive effects from the alleged conspiracy. Ortho argued instead that, under the case law applicable to both per se and rule of reason antitrust violations, there must be a showing of injury-in-fact for each putative class member, and there is no injury-in-fact when the purchaser pays less than the but-for transaction price for each transaction during the class period.

Plaintiffs further confuse the issue by citing *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 489 (1968), which establishes the principle that antitrust defendants cannot seek to reduce antitrust damages by the amount direct purchasers pass on to indirect purchasers. Ortho's argument is not a pass-on

---

(…continued)

*Orthopedic Appliances, Inc. v. Tyco Healthcare Grp., L.P.*, 247 F.R.D. 156, 169 n.17 (C.D. Cal. 2007) (rejecting plaintiffs' argument that defendants did not support net effects argument and noting plaintiffs failed to provide "meaningful market analysis" of the but-for world).

defense.  The standard for antitrust impact is based on what Plaintiffs paid for each

transaction to Defendants, not on what Plaintiffs received in compensation from

downstream customers.[10]

By adopting Plaintiffs' incorrect standard for antitrust impact in its class

certification decision, the district court effectively nullified the essential element of

injury-in-fact and has, consequently, failed to rigorously assess whether or not

Dr. Beyer's benchmark methodology is capable of proving antitrust impact on a

class-wide basis.

## III.   NEITHER THE DISTRICT COURT NOR PLAINTIFFS HAVE EVEN ATTEMPTED TO EXPLAIN HOW, AS A PRACTICAL MATTER, THE FRAUDULENT CONCEALMENT CLAIMS WILL BE TRIED.

Plaintiffs do not dispute that their fraudulent concealment claims raise

individualized issues of notice and due diligence.  *See* Appellees' Br. at 52-53.

Nor do they seem to take issue with the prospect that the number of such issues of

notice and due diligence will grow exponentially when the claims of the putative

---

[10] *In re Cardizem CD Antitrust Litigation*, 200 F.R.D. 297 (E.D. Mich. 2001), raises an entirely different issue.  There, the defendants argued that the plaintiffs were not impacted because the alleged anticompetitive conduct related to a single product that allowed the plaintiffs to stay in business.  *Id.* at 312.  The defendants wanted the court to find there was no impact because the plaintiffs made more money than they would have in the but-for world.  *Id.  Cardizem CD* addressed a single product and the entire period of alleged anticompetitive conduct; it did not consider the pertinent issues Ortho raised in this case – bundles of diverse products purchased in discrete transactions.

class members are added.  Instead, in their Opposition Brief, Plaintiffs appear to rest on the proposition that it is enough to show at the class certification stage that the concealment prong, and only the concealment prong, is subject to common proof.  *Id.* at 53-54.  In essence, Plaintiffs advocate a rule that carves out of every class certification decision any analysis of the individual issues of notice and due diligence, no matter how numerous or complex they may be.

Neither of the two cases Plaintiffs rely on, *Linerboard* and *Sullivan*, endorses such a "per se" rule that individualized issues of notice and due diligence should be ignored at the class certification stage.  *See, e.g.*, *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 162-63 (3d Cir. 2002) ("Predominance under Rule 23(b)(3) cannot be reduced to a mechanical, single-issue test.") (citing *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288 (1st Cir. 2000)).  *Sullivan*, in fact, highlights that analysis of individualized issues is critically important in the class certification context.  667 F.3d at 303.[11]

At trial, Plaintiffs must establish all three essential elements of a fraudulent concealment claim in order to avoid the statutory bar on their pre-May 18, 2005

---

[11] As noted above, *Sullivan* involved review of a settlement class.  Mindful of the "key" distinction between settlement and litigation classes, this Court analyzed the predominance of the individualized issues under a less stringent standard because "we are not as concerned with formulating some prediction as to how [individualized issues] would play out at trial, for the proposal is that there be no trial."  *Sullivan*, 667 F.3d at 303.

damages claims.[12]  *See Forbes v. Eagleson*, 228 F.3d 471, 486-87 (3d Cir. 2000).

Neither the district court nor Plaintiffs (either at class certification or on appeal)

have made any attempt to explain how the thousands of fraudulent concealment

claims will be tried in a way that is both manageable and faithful to Ortho's due

process rights.  For example, will the thousands of individual fraudulent

concealment claims be resolved in one proceeding?  Will the claims be decided at

the same time as the issues of antitrust conspiracy and antitrust impact?  Will

Ortho be permitted to call representatives of each class member to testify on issues

of notice and due diligence?  Will Ortho be permitted to conduct any fact

discovery of the thousands of absent class members in advance of such testimony?

The answers to these questions are a critical part of ensuring that Ortho's

substantive rights, relating to its statute of limitations defense, are preserved.

This Court's statement in *Wachtel* that a trial plan is an "advisable practice"

was not something, as Plaintiffs suggest, to be casually disregarded.  *See*

---

[12] Plaintiffs treat concealment as if it were the *only* element of the fraudulent concealment claims that will be litigated at trial.  For instance, Plaintiffs argue that the Rules Enabling Act does not entitle Ortho to discovery from "thousands" of class members because "[a]dditional information from absent class members will not change the extent to which class-wide evidence will demonstrate whether Defendants concealed the conspiracy."  Appellees' Br. at 54.  Plaintiffs misunderstand that, while additional discovery may or may not affect the concealment prong, it certainly will affect Ortho's ability to present evidence of notice and due diligence, which it will need to do in order to fully defend itself against pre-May 18, 2005 claims.

Appellees' Br. at 56 n.37.  Since the 2003 amendments to Rule 23, courts have

placed even greater emphasis on assessing at the class certification stage the

practical questions of how the case will be tried.  *See, e.g.*, *Wachtel*, 453 F.3d at

186 (in a certification context, "one 'critical need is to determine how the case will

be tried'" (citation omitted)); *Madison v. Chalmette Refining, LLC*, 637 F.3d 551,

557 (5th Cir. 2011) (denying class certification because "in its certification order,

the district court did not indicate that it had seriously considered the administration

of the trial.  Instead it appears to have adopted a figure-it-out-as-we-go-along

approach," which was in conflict with the rigorous analysis requirement (internal

punctuation and citation omitted).); *MP Vista, Inc. v. Motiva Enterprises, LLC*, 286

F.R.D. 299, 312-13 (E.D. La. 2012) (denying class certification because, among

other reasons, "[p]laintiffs have failed to provide a workable trial plan"); *In re*

*Paxil Litig.*, 212 F.R.D. 539, 548 (C.D. Cal. 2003) (identifying an "unworkable

trial plan" as a basis for denying class certification).

    Whether framed as a "trial plan" or not, it is "critical" to have a "full and

clear articulation of the litigation's contours at the time of class certification."

*Wachtel*, 453 F.3d at 186.  In its Class Certification Opinion, the district court has

not articulated how, as a practical matter, the thousands of fraudulent concealment

claims will be tried.  That was another source of reversible error.

## **CONCLUSION**

For each of the foregoing reasons, and for the reasons set forth in Appellant Ortho-Clinical Diagnostics, Inc.'s Opening Brief, this Court should reverse the district court's order granting Plaintiffs' Motion for Class Certification.


Respectfully submitted,

Dated:  June 24, 2013

 s/ Paul H. Saint-Antoine
Paul H. Saint-Antoine (PA ID #56224)
Joanne C. Lewers (PA ID #81195)
Richard E. Coe (PA ID #94539)
Chanda A. Miller (PA ID #206491)
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA  19103-6996
Telephone:  (215) 988-2700

Jerome A. Swindell
Assistant General Counsel
JOHNSON & JOHNSON
1 Johnson & Johnson Plaza
New Brunswick, NJ  08933
Telephone:  (732) 524-0400

*Attorneys for Appellant Ortho-Clinical Diagnostics, Inc.*

## <u>CERTIFICATES OF COMPLIANCE REQUIRED BY FEDERAL AND LOCAL RULES OF APPELLATE PROCEDURE</u>

<u>Fed. R. App. P. 32(a) Compliance</u>

The brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,864 words, as counted by Microsoft Word 2010, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

<u>Anti-Virus Certification</u>

Appellant Ortho-Clinical Diagnostics, Inc.'s Reply Brief was scanned for viruses using Microsoft Forefront Endpoint Protection, and no viruses were detected.

<u>Identical Documents</u>

The electronic and hard copies of Appellant Ortho-Clinical Diagnostics, Inc.'s Reply Brief filed today are identical.

Dated:  June 24, 2013                              s/ Paul H. Saint-Antoine
                                                   Paul H. Saint-Antoine

## **CERTIFICATE OF SERVICE**

I, Paul H. Saint-Antoine, certify that a true and correct copy of Appellant

Ortho-Clinical Diagnostics, Inc.'s Reply Brief was filed electronically using the

Court's CM/ECF System.  This System sent a Notice of Docket Activity to

Appellees' Counsel, who are Filing Users.  In addition, I sent one copy of

Appellant Ortho-Clinical Diagnostics, Inc.'s Reply Brief via hand delivery to

Appellees' Counsel at the address shown below:

> Jeffrey Corrigan, Esq.
> Spector Roseman Kodroff & Willis, P.C.
> 1818 Market Street, Suite 2500
> Philadelphia, PA  19103
>
> *Counsel for Appellees*

Dated:  June 24, 2013          s/ Paul H. Saint-Antoine
                               Paul H. Saint-Antoine